POOLE and another *v.* WEST POINT BUTTER & CHEESE ASS'N and others.

(*Circuit Court, D. Nebraska.* March 28, 1887.)

1. COURTS — FEDERAL — JURISDICTION — CITIZENSHIP — SUIT BY PARTNERSHIP — SOME MEMBERS PLAINTIFFS AND SOME DEFENDANTS.

A bill was filed in the federal court in the name of the four members composing the firm of Kent & Co., two of whom, Kent and Young, were citizens of New York, the state in which several of the defendants resided. Objection being anticipated to the jurisdiction of the court, because some of the plaintiffs and some of the defendants were thus citizens of the same state, an amended bill was filed by Poole and Sherman, two of the partners, making Young and Kent defendants. It appeared that, although the four were partners, their business was conducted by two houses, one in Chicago, managed by Poole and Sherman, and one in New York city, managed by Kent and Young; that the action arose out of a certificate of stock which had been pledged to Kent and Young by the defendant, a debtor of the New York house, and that the New York house, being indebted to the Chicago house, had transferred the debt and stock security in payment. Kent and Young, on being made defendants, filed an answer disclaiming all interest in the stock. *Held,* they might be made defendants, and there was thereafter no objection to the jurisdiction of the court attaching.

2. CORPORATIONS — INCREASE OF STOCK — STATUTORY REQUIREMENTS.

An increase in the capital stock of a corporation, although not made with the formalities required by a state statute, is binding upon the stockholders and the corporation, where it appears that the increase was made with the consent of all the stockholders.

3. SAME — ASSETS — TRUSTS — CREDITORS — STOCKHOLDERS.

As between the creditors of a corporation and its stockholders, the property will in equity be first appropriated to the payment of the creditors; the funds of a corporation are a trust fund for the payment of its debts, and the stockholders have no rights until after the creditors are paid.

4. SAME — PREFERRED CREDITORS — MORTGAGE BY SUPERINTENDENT.

One having money on deposit with a corporation purposed to withdraw it, but permitted it to remain upon the superintendent, who was left in charge of the affairs of the company, executing to him a chattel mortgage. *Held,* although the superintendent may not have been legally authorized to make the mortgage, yet, considering the loose and irregular way in which the business of the corporation was managed, and that he was left in charge of affairs, and the equitable character of the claim, the mortgage must be allowed to be valid, and, the corporation proving insolvent, the mortgagee is entitled to priority as a secured creditor.

5. SAME — MONEY ADVANCED TO PRESIDENT.

A bank advanced money directly to a corporation, and also to the president, to be expended for the benefit of the corporation, which sums were recognized as debts by the corporation, and were attempted to be secured to the bank by each stockholder assigning his shares in the corporation. *Held,* equity would treat both sums as debts due by the corporation to the bank.

6. SAME — PREFERENCE OF SALARY — ASSIGNEE OF STOCK.

A stockholder who so assigned his stock to pay the bank's debt, and afterwards took a bill of sale executed by the superintendent upon certain personal property of the corporation to secure his salary as general manager, is not entitled to enforce the bill until the bank is paid; nor has an assignee of his claim any better rights in the matter than he has.

7. SAME — SUBSCRIPTION FRAUDULENTLY INDUCED — STOCKHOLDER AND PROMOTER.

An action by a stockholder, against the insolvent corporation, to have his share of the assets set apart to him before the claim of a particular creditor should be paid (by whose fraudulent representations he alleges he was induced to become a stockholder) is not a proceeding to dissolve the corporation, and it is not necessary for him to allege his previous efforts to induce the corporation to bring the action.

v.30F.no.8—33

8. SAME—PLEDGEE OF STOCK A SHAREHOLDER.

Where shares of stock in a corporation are assigned by a debtor to his creditor as collateral security for the debt, and are duly transferred on the books of the company, the creditor becomes a stockholder, and entitled to all the rights of such.

9. SAME—ULTRA VIRES—ESTOPPEL.

The stockholders of a corporation having acknowledged the liability of the company for a particular debt, they cannot afterwards repudiate it on the ground that it was in excess of the indebtedness which the corporation was authorized by law to contract.

In Equity.

C. N. Powell and E. B. Gould, for complainants.

F. T. Ransom, for receiver Middletown Bank.

J. L. Webster, for defendant association.

N. Bruner, for Chancey.

BREWER, J. This is a wreck. Gross mismanagement, culpable disregard of the extent of corporate power, and of the regularity of corporate proceedings, unquestionable dishonesty, and false representations have caused what might be expected, and now, in this court, in this case, have come many parties, each seeking to save something from the general wreck. It is very difficult to work through such a confused mass, and determine the real facts, and adjust rights and liabilities on an equitable basis. Let me outline the principal facts.

On May 13, 1878, the West Point Butter & Cheese Association was incorporated under the laws of the state of Nebraska. By its charter its capital stock was $25,000, divided into 250 shares of $100 each. By the same charter its indebtedness was limited to one-half of the capital stock. The six shareholders and incorporators were B. D. Brown, W. B. Eager, Chauncey Hale, T. King, J. J. King, and J. A. Brown. The latter soon assigned his stock to his brother B. D. Brown, and the entire stock was owned by the five in the following proportions: B. D. Brown, 105 shares; W. B. Eager, 35 shares; Chauncey Hale, 35 shares; J. J. King, 30 shares; Thomas King, 45 shares. At the organization these five gentlemen were elected directors, and by them B. D. Brown was elected president; W. B. Eager, vice-president; C. Hale, secretary; Thomas King, treasurer; and J. J. King, superintendent. There was no subsequent election of officers, and these gentlemen therefore continued in office during all the transactions involved in this case.

The purposes of this organization were disclosed in the third article of the charter, which reads:

"The general nature of the business to be transacted by this corporation shall be the manufacture of butter, cheese, flour, feed, raising stock, buying and selling stock and real estate, and buying and selling grain and flour, and for the transaction of such other business as may be deemed conducive to the best interests of this association."

On October 20, 1879, it leased from the West Point Manufacturing Company its property, consisting of real estate, with mills, machinery, etc., for a term of one year, at a rental of $300 per month, payable

monthly in advance. By the lease it had the privilege of adding any machinery, or making any improvements, with the right of removing such machinery and improvements at any time within 60 days after the termination of the lease. Though this lease was but for a year, it was in fact continued without further writings until the commencement of this suit. This manufacturing company had a capital stock of $500,000, divided into shares of $25 each. Thomas King, the treasurer of the association, was the president of the Middletown National Bank, located at Middletown, New York. He and Brown were, prior to the incorporation of the association, the owners of certain real estate in the state of Nebraska. They were the promoters and organizers of the association, and transferred to it that real estate as property with which to commence its operations. Brown, the president of the association, was evidently a bold and reckless speculator, with many irons in the fire. Besides the business of the association, he bought and conducted a bank, bought, sold, and shipped grain, was engaged in building an elevator, and in perhaps other enterprises. He borrowed largely from the Middletown Bank, used large sums in increasing the property and business of the association, as well as improving the property of the manufacturing company. He seems to have been the responsible manager of both the association and the manufacturing company, borrowing money, contracting debts, and making improvements and purchases, without any direct authority from the directors. In 1883 the properties of the association had largely increased, so that by an inventory they amounted to $160,-000. On September 21, 1883, by consent of all parties, at a meeting of the directors, the capital stock of the association was increased to $250,000. Brown, who had a year before purchased and since been running the Elkorn Valley Bank, turned that into the association at $80,000. He agreed to add $10,000, taking for these two properties $90,000 in stock of the association. The balance of the increase stock was distributed *pro rata* among the five stockholders, giving to Brown 567 shares, to Eager 189 shares, to Hale 189 shares, to J. J. King 162 shares, and to Thomas King 243 shares.

Nothing was paid into the association by these several stockholders for these additional shares, but they were distributed among them by consent of all, and on account of the increased value of the properties of the association. The formalities required by the statutes of Nebraska with respect to an increase of the capital stock were not complied with; but, as this increase was made by the consent of all the stockholders, it must, as to each of them, and as to the corporation, be considered as valid and binding. During the forepart of 1883, Brown's indebtedness to the Middletown Bank, amounting to some hundreds of thousands of dollars, much of which was borrowed and spent for the benefit of the association and manufacturing company, the bank was notified by the government inspector that this amount of indebtedness must be reduced. To secure so much of the indebtedness as was for the benefit of the association, each of the five stockholders assigned in writing his stock to the Middletown National Bank. The 105 shares

originally issued to Brown had been theretofore by him assigned to a bank at Indianapolis, of which William H. English was president; but Brown, representing that he had lost this certificate, obtained a duplicate from the association, and assigned the duplicate to the Middletown Bank. In October, 1883, Brown obtained from the Middletown Bank the certificate for the 800 shares issued to him on account of the Elkorn Valley Bank, claiming that it was never his intent to assign that to the bank, and deposited it with the firm of E. A. Kent & Co., of New York city, as collateral security for moneys to be advanced to him. Upon this security they did in fact advance several thousand dollars. In the fall of 1884 the Middletown National Bank suspended, and the collapse of the association came. And there are now before the court five parties, insisting upon rights in the property. At the institution of this suit a receiver was appointed, and the property taken possession of, and is now in the custody of the court. The *first* of these parties is the cross-complainant, the receiver of the Middletown National Bank, who claims as creditor secured by the assignment of stock heretofore referred to. *Second.* The plaintiffs, Poole and Sherman, two members of the firm of Kent & Co., who claim that they alone are entitled to the benefit of the 800 shares of stock left as collateral; that the firm took that collateral by virtue of and in reliance upon representations made by the officers of the Middletown National Bank, over whose claims as a creditor they thereby insist that they are entitled to preference and priority. *Third.* D. W. Clancey, who claims as a depositor in the Elkorn Valley Bank, and secured by a chattel mortgage given by the association through J. J. King, its superintendent. *Fourth.* W. B. Eager, and his assignee, John Wannamaker, who claim as creditors secured by a bill of sale executed by said King as superintendent. *Fifth.* The manufacturing company, and John D. Neligh, its president, who claim that the company should not be brought into this suit, and that no accounting should be had as to the transactions between the association and the company.

There are two questions presented at the outset, affecting the jurisdiction of this court. The original bill was filed in the name of four members of the firm of Kent & Co., two of whom, Kent and Young, are citizens of New York, the state in which several of the defendants reside. The present and amended bill, in the name of Poole and Sherman alone, as complainants, makes Kent and Young defendants, and alleges that the sole interest in the stock above referred to is in them. Now, the claim is that, as a matter of fact, all of the members of the firm of Kent & Co. are interested in this stock, and should be plaintiffs; that, where some of the plaintiffs and some of the defendants are citizens of the same state, this court has no jurisdiction; and that the substitution of Kent and Young from the position of plaintiffs to that of defendants was wrongful, collusive, and simply for the purpose of giving this court jurisdiction.

The facts in respect to this matter are these: There was a firm of Poole, Sherman & Co. doing business in Chicago, and another of Kent & Co. doing business in New York city. The same parties were members of

both firms. In fact it was the same firm doing business in two places under different names. The New York house advanced the money and received the stock. It lost in its business, while the Chicago house made money in its. There has been no final settlement and division between the parties, but, before the original bill was filed, the New York house, being in need of money, asked and obtained several thousand dollars from the Chicago house, and sent to them, with other property, this stock. The only witnesses who testified, being Kent & Young, the citizens of New York, and the managers of that branch of the business, tsetified that they intended to transfer this stock to Poole and Sherman, the Chicago members of the firm, personally as security to them for the money advanced, and for the balance which they are satisfied will be found due by themselves to them on the final adjustment of the partnership affairs. They have also filed an answer disclaiming any interest in the stock. Under these circumstances, it seems to me, it would be resting upon the letter and ignoring the spirit of the transaction to hold that they were still legally interested in this stock, and for that alone, after all that had been done, to dismiss the case as outside the jurisdiction of this court.

2. It is insisted that this is a proceeding to dissolve a corporation; that equity has no jurisdiction over such an action; and also that whatever rights the plaintiffs are seeking to assert are rights vested in the corporation, and which it was proper for it in the first place to assert; and that there is no sufficient proof of any satisfactory efforts to compel action by the corporation before the commencement of this suit by stockholders. Obviously, this is not a mere action to dissolve a corporation, nor is the right asserted by plaintiffs one properly to be asserted by the corporation. The paramount question is not one between the corporation and its creditors, but between a stockholder and the principal creditor, the former claiming a priority over the latter out of the assets of the corporation,—a question which it is not the province of the corporation itself to settle, and which can be settled fairly only in a direct proceeding between the stockholder and the creditor. Further, as I said, this is not a proceeding merely to dissolve a corporation; it is an action by one claiming an interest in the property of an insolvent to subject that property to the payment of his claim. It matters not to this case whether the corporation continues to exist, or by decree of court is formally dissolved. It is not the corporation, but the corporate property, which is the burden of this litigation. I think, therefore, both objections must fail, and that it is the duty of the court to proceed to determine the rights of the various parties to the property.

It may be remarked generally, in the first place, that there may be three parties whose rights are to be determined in the winding up of the affairs of a corporation, to-wit, a secured creditor, an unsecured creditor, and the stockholder. The secured creditor, to the extent of his security, is first entitled to protection. Beyond that security he is simply a general and unsecured creditor. As between creditors and stockholders, in equity the property is first appropriated to the payment of the creditors.

The funds of a corporation are a trust fund for the payment of its debts, and the stockholders have no rights until after the creditors are paid. This is elementary, and needs no citation of authority.

I notice, *first*, the claim of D. W. Clancey. He was a depositor in the Elkorn Valley Bank, which was turned over to the association by B. D. Brown for the 800 shares which afterwards passed to complainants. Before the collapse he became worried about his deposit, and proposed to withdraw it, but permitted it to remain on the assurances of King, the local superintendent, and the man in actual charge of the affairs and management at West Point, that security would be given him if desired; and, in pursuance of those assurances, certain warrants were in fact turned over to him, and a chattel mortgage given by such superintendent. Now, considering the loose and irregular way in which the affairs of this association were managed, I do not think I need stop to inquire whether this chattel mortgage was executed by a party legally authorized to sign such papers for the corporation. The debt, it is conceded, is a just one, and the security was given by one left by his associates in the actual charge and management. Equitably, I think he is entitled to be recognized as a secured creditor, and to be paid in full, and that will be one provision in the decree.

I notice, *second*, the claim of the cross-complainant, the receiver of the Middletown Bank. His claim arises for moneys advanced by the bank directly to the association, and also moneys advanced by it to Brown which were by him expended for the benefit of the association, and which were recognized by the association uniformly as debts of the association, and which were attempted to be secured by an assignment to the bank by each stockholder personally of his shares. I think equity will jump all intermediate transactions, and treat both amounts as debts from the association to the cross-complainant.

In the *third* place the claim of Eager, and his assignee, Wannamaker, is for the salary of Eager as general manager, as well as moneys advanced by him to the corporation. He also obtained a security of a bill of sale upon certain personal property, executed by Supt. King just before the collapse of the company. It is evident to me, from the testimony of the transactions between Eager and Wannamaker, that the latter has no higher claim than the former; and as Eager, before this bill of sale, had assigned his stock to the Middletown Bank, with the intention on his part, as well as on the part of other stockholders making like assignments, to secure the debt of the association to the bank, he is not now entitled to payment until after the bank is satisfied in full.

I pass now to the claim of the complainants, and here arises the great controversy in this case. The stock was assigned as collateral for moneys advanced to B. D. Brown. It was duly transferred on the books of the company, so they unquestionably have all the rights of stockholders. *Pullman* v. *Upton*, 96 U. S. 330; *National Bank* v. *Case*, 99 U. S. 628; *Vail* v. *Hamilton*, 85 N. Y. 453; Colebrook on Collateral Securities, 366. But simply as stockholders they would have in equity no claim upon this property until the creditors were fully paid. They insist that they were

induced to take the stock by false representations made by the officers of the Middletown Bank as to its value and the condition of the association and its property, and that, having taken this stock in reliance upon those representations so falsely and fraudulently made, they are entitled to priority over the bank. This is, as I said, the principal controversy in the case. It is beyond any dispute from the testimony that representations were made by some of the officers of the bank to Kent & Co. But were these representations misrepresentations of existing facts, or mere expressions of opinion as to values and prospects? Were they made by an officer of the bank authorized to speak for and bind it in such a matter? Were they of such a character as would naturally mislead prudent business men? And did the complainants in fact rely upon such representations, and, from such reliance, part with their money? It would be impossible for me to review in detail all the testimony bearing upon this matter. I must content myself with noticing some salient facts. And, first, Brown was no stranger to Kent & Co. They had large dealings with him for months prior. He had consigned grain to them for sale; he had bought and sold stocks through them; and, at the very time they received these certificates of stock, he was largely indebted to them on account of prior dealings. He was engaged in building an elevator at Burlington, Iowa, representing it to be the largest and most complete in the west. He represented that the money which he wanted was for the purpose of completing that elevator. He transferred to Kent & Co. stock in that elevator, as well as the stock in question at the same time. It is claimed, it is true, that the elevator stock was transferred as security for the past indebtedness, and the stock in question only as collateral for future advances. At the time of giving Kent & Co. the stock in question, or within a day or so thereafter, he presented two letters, signed by King, president of the Middletown Bank, as follows:

"OCTOBER 17, 1883.

"*Mess. E. A. Kent & Co., N. Y. City*—GENTLEMEN: By request of Mr. Brown, I would say that the West Point Butter & Cheese Association, of West Point, Nebraska, has recently increased its capital stock to $250,000, which is fully paid. It has been prosperous since its organization, and its future, I think, is very promising.

"Yours, respectfully, THOMAS KING."

"OCTOBER 19, 1883.

"*Mess. E. A. Kent & Co., Broad Street*—GENTS.: If Mr. Brown wishes to use any of the West Point Butter & Cheese Association stock as a collateral for a loan, we consider the stock good for its face value.

"Yours, respectfully, THOMAS KING, Pr."

A few days thereafter they directed their attorney, Mr. Gould, to examine into the condition of the association, and report the value of this stock. Before, however, any report was made by him, they had advanced many thousand upon this stock, and for such advancement the only pretense of claim against the Middletown Bank rests in these two letters. In these letters there is an opinion expressed as to the value of the stock, and the prosperity of the association,—an opinion, which,

judging from the amount of money advanced by the Middletown Bank, would seem to be no more than an honest expression of confidence. The assertion that the stock had been increased to $250,000, and that it was fully paid, was a statement of fact warranted by what had actually transpired. Beyond that there is nothing in these letters. Mr. Gould, the attorney, went up to Middletown to make an examination. In the evening, after his arrival, he met the officers of the association, examined their books, and heard their statements,—all of which were exaggerated, some of which were untrue. The president of the bank was not present; but he met him in the morning, before leaving for New York; and, in the course of a conversation between them, the president gave him strong assurances of the value of the stock, and the confidence that the bank had in it, its habit in the past to loan on the security of such stock, and its belief in its value as security in the future. Mr. Gould testifies, it is true, that the president said to him that the association was not in debt, at least beyond some trifling amounts,—a statement which was obviously and grossly untrue. In this he is not supported by either the president or Mr. Brown; and the letter written by him to Kent & Co. immediately after his return to New York, containing his report of the examination that he had made, fails to disclose any such statement as coming from Mr. King. I think it probable, therefore, that Mr. Gould is mistaken as to the person who made that statement; but, whether so or not, such statement does not seem to have been conveyed to Kent & Co., and so they did not act in reliance thereon. It also appears that Mr. Gould came west both to Burlington, Iowa, and to West Point, Nebraska, and made a personal examination into both properties. I think his correction in his later testimony as to the date is probably right, and that this western trip was not made until after his visit to Middletown. But, be that as it may, he discovered nothing in his western trip which led him to advise Kent & Co. to withdraw their confidence in Brown. On the contrary, he seems to have been personally infatuated with the enterprises, and thereafter had on his own account personal dealings with Brown to a large extent. The truth of the matter seems to be that Mr. Brown was a man of vast schemes, with a power of impressing upon others a belief in their feasibility, and a conviction of the extent of his resources. He led the Middletown Bank into extravagant loans to him on account of his various enterprises, and in like manner he obtained money from Kent & Co., and also from Mr. Gould. But, after reading all the testimony bearing upon the question of the misrepresentations of the bank, and their influence upon Kent & Co., it seems to me the complainants have failed to show that Kent & Co. parted with their money in reliance upon any misrepresentations of fact made by the officers of the bank.

One other matter is suggested, and that is the illegality of the increase of the stock from $25,000 to $250,000, and the limitation both in the statutes of Nebraska and in the charter of the company against the amount of indebtedness. The complainants hold only stock which was thus irregularly issued, and I do not think it lies in their mouth, or, in-

deed, in the mouth of any of the original stockholders cognizant of the fact, and assenting thereto, to question the liability of the corporation for the entire debt created in favor of the Middletown Bank. No man can plead his own wrong to defeat an honest debt. I shall therefore have to find against the claim of the complainant to priority of payment over the cross-complainant.

The last matter is that of the manufacturing company's claim. It, as I have stated, leased its property to the association. The latter obtained a large proportion of the manufacturing company's stock, and had gotten possession of a series of bonds issued by it, which, however, afterwards passed into the hands of the Middletown Bank. Exactly what the state of the account would be between the manufacturing company and the association it is impossible now to tell. I think, however, as the parties are all before the court, the true way would be to have that account stated. Then, perhaps, the receiver might be directed to sue the manufacturing company, to sell the claim of the association against the manufacturing company, or in some other way to realize the amount that shall be due, if there be any such amount.

I believe this covers all that I need now consider. A decree will be entered, finding the rights and equities of the parties in the manner heretofore indicated, and referring the case to a master to examine and report—*First*, the amount due Clancey, principal and interest; the value of the securities transferred by the superintendent to him, as well as all amounts realized therefrom; *second*, the amount due Wannamaker, principal and interest; *third*, the amount due the cross-complainant; *fourth*, the account between the association and the manufacturing company; and, *fifth*, the amount of money now on hand after the payment of all the intervening claims. A final decree will be entered on the coming in of such report.