G. V. B. MIN. CO. v. FIRST NAT. BANK OF HAILEY.

(Circuit Court of Appeals, Ninth Circuit. May 2, 1899.)

No. 507.

1. CORPORATIONS—CONTRACTS—MANNER OF DOING BUSINESS.

Where the business of a corporation has habitually been transacted in an irregular manner, without observing the formalities legally required to bind it, with the knowledge and acquiescence of its stockholders, and it has in such manner made contracts and incurred obligations, the strict rules of law, however well settled, limiting the mode of exercising the

powers of corporations by their officers, are not applicable to such contracts, as against third parties who have dealt with the corporation in good faith, and with knowledge of its manner of doing business.

2. SAME—POWERS OF OFFICERS—ESTOPPEL.

Where the president of a corporation is permitted to exercise full power and authority in the conduct and management of its business, and deals with the property and affairs of the corporation in such a manner and for such a length of time as to justify others with whom he transacts business in believing that he had authority to do the acts in the manner he does, such third persons have a right to deal with him on the assumption that he has such authority, and the corporation, having knowledge of such acts, and of the manner in which the corporate business is transacted, cannot thereafter, to the injury and prejudice of such parties, deny his authority or disaffirm his acts.

3. SAME—RETENTION OF BENEFITS.

A corporation which receives the benefit of money borrowed by its president, for which he executed the notes of the corporation, secured by a mortgage on its property, and which, with full knowledge of the facts, procures successive renewals of such notes through a number of years, cannot thereafter, for the first time, deny their validity.

4. SAME—MORTGAGES—CONSENT OF STOCKHOLDERS UNDER NEW YORK STATUTE.

2 Laws N. Y. 1892, c. 688, requiring the written assent of two-thirds of the stockholders as a condition precedent to the execution of a mortgage by a corporation, as construed by the courts of the state, was intended for the protection of the stockholders against the improvident or collusive acts of the officers in incumbering the property of the corporation; hence the form of assent by the stockholders is immaterial, if the intention is clear, and a mortgage executed in behalf of a corporation by its president, with the written indorsement thereon of the assent of another stockholder, who, together with the president, at the time owned more than two-thirds of the stock, is valid under such statute.

5. SAME—SEAL—ADOPTION OF SCROLL.

Where a mortgage executed in the name of a corporation recites that the seal of the corporation is affixed, and following the signature of the president is the symbol "[L. S.]," such symbol will be regarded as having been adopted and used for the occasion as the seal of the corporation, and the mortgage will not be held invalid, if in all other respects properly executed.

6. SAME—ULTRA VIRES.

The doctrine of ultra vires has no application to notes and a mortgage executed by the president in the name of a corporation which has power to execute such instruments, and the corporation may be estopped, by its subsequent conduct in ratification of the action of the president, to allege his want of authority or any informality in their execution to defeat its liability thereon.

Appeal from the Circuit Court of the United States for the District of Idaho.

This suit was instituted by the First National Bank of Hailey, in the state district court of Idaho, against the G. V. B. Mining Company, a corporation, to foreclose a mortgage executed June 12, 1895, upon the Red Elephant group of mines, situate in Blaine county, Idaho, for the sum of $6,500, evidenced by two promissory notes, with interest, costs, and attorney's fees. The cause was subsequently removed to the United States circuit court for the district of Idaho, and was there tried, and a decree entered in favor of the complainant, as prayed for in its bill of complaint. 89 Fed. 439.

The complaint, among other things, alleges: "That in said mortgage, as written, there is a clerical error in one of the 'calls,' in the description of the part of the 'O. K.' lode described, in failing to give the minute call of the last course in said description, which in the description herein given is corrected to conform to the fact; that said mortgage should be reframed to conform to the intention of the parties thereto, as above alleged, and the said Senator and

Sumol lode claims be, by order and decree of this court, included in the property described in, and mortgaged by, the said mortgage, and included and embraced in the decree of foreclosure and sale in this action."

The answer of the G. V. B. Mining Company denied the existence of any indebtedness whatever. It denied the execution of the notes and mortgage sued upon, or either of them; and further denied that it made any mistake in describing any property mortgaged to plaintiff, or omitted to include any property it intended to mortgage, or erred in any description or call in any mortgage, to plaintiff, or at all.

The general facts, as developed at the trial, were substantially to the effect that, prior to 1891, G. V. Bryan and G. W. Venable were, or claimed to be, the owners of the Red Elephant group of mines, although the interest of Venable therein was held in the name of George B. Howard. They kept an account with appellee in the name of "G. V. Bryan, Superintendent." On February 9, 1891, the G. V. B. Mining Company was incorporated, under the laws of the state of New York, with a capital stock of $500,000, divided into 5,000 shares. Bryan and Howard conveyed the Red Elephant group of mines to the corporation, and received in exchange all of its capital stock. Bryan received three-fourths, and Howard, representing Venable, one-fourth. Howard afterwards transferred the one-fourth to Venable, and Venable transferred 350 shares to one Heyman, and pledged 1,850 shares to Henry Aplington and R. J. Dean, as trustees for Mrs. H. K. Thurber. Bryan gave one share of his stock to one Donnelly, and another to Howard, so as to qualify them to act as directors of the corporation. On February 18, 1891, the stockholders met, and elected Bryan president, Howard secretary, and H. K. Thurber treasurer, and adopted by-laws, sections 7 and 8 of which read as follows:

"Sec. 7. The president shall preside at all meetings of the board of trustees, when present. In the absence of the president, the trustees may appoint a president pro tem. from their number. The president shall sign all certificates of stock and bonds, and may sign other obligations of the company. In the absence of the president, or in case of his inability to act, the trustees may appoint from their number a person to perform the duties of the president. The president shall perform all duties required by law, or that are usually performed by the president of a corporation.

"Sec. 8. It shall be the privilege of the president or treasurer to have the care and custody of the funds of the company, and to deposit the same in such bank or banks as the trustees may elect. The treasurer may sign all notes, checks, drafts, and orders for the payment of money made by the company. He or the president shall render a statement of his cash account at each meeting of the trustees, if required, and shall, at all reasonable times, exhibit his books and accounts to any trustee of the company upon application at his office. He shall countersign and affix the seal of the company to all certificates of stock signed by the president."

The articles of incorporation provided, among other things, that the objects for which said corporation was formed were to carry on the business of mining for gold, silver, etc., a part of its business to be carried on in Alturas (now Blaine) county, Idaho, and elsewhere in said state. On the 21st day of May, 1891, the directors held another meeting, and amended the by-laws so as to relieve Mr. Thurber from his duties as treasurer, and no other meeting was ever held by them, or anybody else, for the corporation, until September 16, 1895. After this incorporation, the business between the bank and the corporation was conducted in the same manner as before. Checks were drawn, and payments made thereon credited, nearly every day, until after June 12, 1895. There was never any controversy or suggestion as to the legality of these acts. None of the transactions was ever questioned by any party. Bryan borrowed money from time to time; overdrew his account; gave his notes, either as superintendent or president,—sometimes both. In other words, Bryan and Venable transacted the business of the corporation as if they were the sole owners thereof.

There is a sharp controversy arising out of a conflict or dispute in the testimony as to the number of shares of stock owned by Bryan and Venable, on June 12, 1895, at the time the mortgage was executed. Bryan, in answering an interrogatory upon this point in his deposition, said: "The only stock, to

my knowledge, standing upon the books of the company, in any other name than that of myself and Mr. Venable, was 350 shares owned by the Heymans, and 2 shares which I gave to two gentlemen in New York to make them directors of the company. * * * I don't think there was any transfer on the books. If there was any transfer on the books, I didn't know of it. I don't think there could have been, without my knowledge." When H. K. Thurber was on the witness stand, he was requested by appellant to refer to the stock book of the G. V. B. Mining Company, and from the book ascertain how the stock stood on June 12, 1895. Objection was made that the book was not competent. The court said that the book would show what stock was issued at certain dates, and that this might be shown, but that the evidence was not conclusive that the ownership of that stock continued for any length of time, and further said that no one could tell from that book where the stock was and who owned the shares at any given date. Appellant's counsel then asked the witness if he knew, of his own knowledge, "how the stock was owned on June 12, 1895." He answered, "I do, or very nearly." In reply to the question, "State, as near as you can," he said that Olive M. Bryan owned 1,000 shares; R. J. Dean and Henry Aplington, 1,850 shares; George V. Bryan, 498 shares; George W. Venable, 300 shares; Heyman, 350 shares; Dean, 1,000 shares; and the two odd shares make up the 5,000. This testimony was, of course, subject to the ruling of the court as to its effect. George W. Venable testified that, at the date the mortgage was executed, "Col. G. V. Bryan owned one-half; I owned a quarter; and my partner, Moses J. Heyman, owned a quarter." He further said that 1,850 shares of his stock were in the names of Henry Aplington and R. J. Dean, as trustees. "They held it as collateral security."

The weight of the direct testimony, notwithstanding some apparent discrepancies in the testimony of Mr. Venable, and all the surrounding circumstances of the transaction, establish the fact that Bryan and Venable, at the time the mortgage was executed, were unquestionably the owners of more than two-thirds of the capital stock. The agreement executed July 11, 1895, between Bryan and Venable, of the first part, and H. K. Thurber, of the second part, recites: "And whereas, the said parties of the first part are the principal stockholders in the G. V. B. Mining Company." There is no pretense that any change in the ownership of the stock took place after the mortgage was executed and the time of the signing of this agreement. The testimony shows that Bryan was a director of the bank from January, 1893, to January, 1896. He was present at the meeting when the question came up of taking a mortgage to secure the notes from the G. V. B. Mining Company. "He made his application for the loan, and then withdrew, and went away, and left the other members there to discuss the matter, and he took no part in the proceedings with reference to it at all." There is no testimony in the record tending to show any conspiracy or collusion between the bank and Bryan in any of the transactions between the bank and the mining company.

There is a mass of testimony in the record as to whether or not Bryan and Venable, in 1894, used any money upon mining claims not owned by the corporation. Without entering into any of the details of this testimony, it may be said that the testimony shows that some of the money obtained upon some of the notes given by Bryan as president was used by Bryan and Venable upon mines which they owned individually at Silver City, Idaho, and that appellee had some knowledge of that fact. The testimony fails to show that there was any fraud, conspiracy, or design on the part of the bank to defraud the corporation. On the other hand, the testimony shows that there was no bad faith on the part of the bank, and that the amount for which the mortgage was given was actually due from the corporation. R. F. Bullard, president of the appellee, upon this point testified as follows: "We had information from Col. Bryan, and it was a common rumor around and commonly reported, that Bryan and Venable were engaged in mining down at Silver City; that there was a claim that they were operating on,—the Tiptop and another claim. I never asked who owned the property. We never had any information—never made any inquiry—about that. We did not consider that it was any of our business. We thought they had a right to mine wherever they pleased; but we understood that they were spending quite a good deal of money down there at Silver City, although how much I could not say. We also understood that they were

getting money from other sources,—Salt Lake and other places,—and investing it down there; but as to whether or not it belonged to the company, or was invested individually, we never were informed, and we did not consider that it was necessary to make any inquiries on that subject. * * * I never had the slightest idea of their using any money belonging to the company wrongfully. As we understood that they were the principal owners of the stock in the company, and they claimed that they were making a great deal of money at the time, * * * we thought that whatever they were spending they had a right to spend, and that it belonged to them, out of the dividends or profits of the company, and they were managing that business for themselves, and we had nothing to do with it,—had no control over it at all. We thought that whatever they were doing they had a right to do."

The management having involved the property in debt, H. K. Thurber, on July 11, 1895, entered into a contract with Bryan and Venable, by which they agreed to procure an extension of time of payment from appellant's creditors, and that all its property should "be placed under the management, direction, and control of said H. K. Thurber, as general manager." An agreement was then procured from the creditors, including the appellee, by which they agreed to extend the time of payment of their claims, and to forego legal proceedings against the company, and that said "Thurber was to have full and exclusive charge and control of the property," and to make certain payments to the creditors from the proceeds of his operations. This contract was twice renewed, and was continued until April, 1897, during which time Thurber paid the creditors about 31 per cent. of their claims, and as late as January 18, 1897, by his letter to the appellee, proposed to continue such payments. An alleged meeting of the stockholders of the corporation was held at New York City on September 16, 1895, at 2 p. m., at which 1,850 shares of stock were voted for directors, but whose stock, or by whom voted, does not appear. This, however, is the same number of shares which was previously placed in the hands of Aplington and Dean by Venable as collateral security for a debt of $70,000, which he owed Thurber. It does not appear, with any degree of certainty, who was present at this meeting; but Aplington acted as chairman, and one George E. Field as secretary, and they and Nancy Thurber were elected directors. Immediately upon the adjournment of this meeting, and at the same place, a so-called "directors' meeting" was held, at which were present only said Field and Aplington, who elected themselves chairman and secretary of the meeting, and the following officers of the corporation were then elected, viz.: Nancy Thurber president, H. K. Thurber treasurer, general manager, and superintendent, and Aplington secretary, of the company. At this meeting it was ordered that H. K. Thurber, "as such general manager and superintendent," shall have charge of the property of said company, and manage and control the business and mines and property of said company, subject to the president (who was his wife) and the board of directors, composed of his wife, his nephew Aplington, and Field, neither of whom is shown to have been a stockholder. The next meeting was on February 3, 1897, when Field and Aplington alone met as a board of directors, and authorized "a proposed lease" of all the company's mines and property to Aplington, which, it otherwise appeared, had already been made by Nancy Thurber as president, and H. K. Thurber as treasurer, of the company, on January 1, 1897; and at the same meeting they ratified a prior sale by the president, Nancy Thurber, to Aplington, of all personal property of the company. February 10, 1897, a directors' meeting was held by Field and Aplington, at which Thurber was appointed resident agent upon whom legal process could be served. The same two parties next met as a board of directors on April 7, 1897, and ratified the assignment made on January 1, 1897, by Mrs. Thurber as president, and H. K. Thurber as treasurer, of the company, to Aplington, of all royalties arising from certain leases on the company's mines. On October 6, 1897, a stockholders' meeting was held, at which were chosen John C. Bouton, holding one share, chairman, and Field, secretary; whereupon resolutions were adopted condemning as unauthorized the notes and mortgage in suit, and empowering the president to resist this action, also, to "ratify, confirm, and approve" the lease, the sale, and the assignment of royalties to Aplington, above referred to, and then the meeting elected Bouton, Field, and Susan Venable directors. Upon the adjournment of

this meeting, a directors' meeting was held, at the same place, at which were present Bouton, Field, and Susan Venable, when new officers were elected.

In this connection, it should be stated that, while the contract with the creditors to forbear legal proceedings above referred to remained in force, Aplington, on January 12, 1897, commenced his action in the state court against the corporation, service being made upon Thurber as agent, upon several notes given by him as treasurer at different dates, commencing July 12, 1895, and on January 28, 1897, recovered judgment by default for about $13,000. This judgment, however, was afterwards set aside on an appeal taken by appellant herein. Applington v. Mining Co. (Idaho) 55 Pac. 241. In this suit four separate appeals have been taken,—one by appellant herein, one by appellee against Arthur Brown as intervener, one by Brown as an intervener, and another by Henry Aplington as an intervener. The appeals by the interveners and by appellee will be considered in a separate opinion. 95 Fed. 35.

A. F. Montandon, for appellant.

Lyttleton Price, for appellee.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge, after stating the facts, delivered the opinion of the court.

We have stated the facts in this case at great length, in order that the general expressions in this opinion may be interpreted and understood in the light of all the circumstances disclosed by the record. The peculiar and irregular manner in which the business of the corporation, appellant herein, was transacted, necessarily leads to many complications, and presents several legal questions of an important character, as to how far such transactions can be upheld by the courts. Conceding, as we shall, for the purposes of this opinion, that the stockholders of the corporation might have objected to being bound by the acts of Bryan and Venable, if they had made timely objections thereto, the answer is that they did not make any such objections, and are not asking for any relief herein, except under the name of the corporation.

Can appellant take any advantage of its own wrong or of any of the irregular acts of its officers? Can it, after allowing Bryan and Venable to pursue the course they did, holding them out to the world as qualified to transact the business in the manner stated, be allowed to deny their authority? Should a court of equity visit their faults of omission or commission upon innocent parties who acted in good faith, honestly believing that Bryan and Venable had authority from the corporation? Do the facts show, as appellant claims, that the appellee had full knowledge of the true state of facts, and acted with its eyes wide open, knowing that the acts of Bryan and Venable were without authority of law? It may be admitted that the bank seems to have transacted business with Bryan and Venable in a careless manner, without much regard to strict banking principles; but it is not shown that, as against the G. V. B. Mining Company, or any of its stockholders, it has been guilty of any wrongdoing which, under the law, in the light of all the facts, will prevent it from maintaining this suit.

Before proceeding to a discussion of the interesting legal questions involved herein, we deem it proper to make some general ob-

servations as to the nature and character of the corporation that was formed by Bryan and Venable, conducted and managed by them until July 11, 1895, and afterwards by H. K. Thurber, because we are of opinion that, at the outset, some distinction ought to be made between genuine, bona fide corporations, organized for the legitimate purpose of conducting a business which requires a combination of persons and of capital, to make the business successful, as distinguished from the character of a corporation organized and conducted, as this was, with a view to conduct and carry on the business in the same manner and way as if no corporation, in fact, had been formed. In the early history of the transactions, Bryan and Venable were in fact the corporation. They acted in the same manner—transacted business in the same way—as well after, as before, the corporation was formed. The court ought not overlook these peculiar facts and conditions. In endeavoring to sustain and uphold a law made for the protection of innocent stockholders, we should be careful not to announce a doctrine that would permit the leading stockholders, under the guise of a corporate name, to commit frauds by taking advantage of their own wrong. While Bryan and Venable were directors in name, they were also the principal stockholders in fact, and were merely using the corporate name for the advantage and benefits which they might themselves derive therefrom.

We have said that Bryan and Venable constituted the corporation from the time of its organization up to, and at the time of, the execution of the notes and mortgage upon which this suit was brought, and it might be added that they continued as such until H. K. Thurber assumed the management and control. Venable thereafter acted with the Thurber party. In the light of the entire history of the corporation, as shown by the record in this case, it might be, perhaps, more properly said that Bryan, until July 11, 1895, by the consent of all parties interested and concerned, and H. K. Thurber thereafter, were to all intents and purposes the G. V. B. Mining Company; that, as was said by the circuit court, "the so-called directors and officers in New York constituted simply the dumb machinery, entirely directed by these parties, and through whom they operated when it was necessary to invoke the legal status of the corporation to strengthen their hands or advance their objects."

In the consideration of the legal questions herein presented, it must constantly be borne in mind that we are confining ourselves to the peculiar facts established by the evidence, as distinguished from the general principles applicable to the power of officers to bind the corporation. We are called upon to deal solely with exceptions to the general rule. In this view it becomes unnecessary to discuss the various authorities cited by appellant's counsel as to the general manner in which corporations are legally authorized to transact their business. The vital question is whether, from the manner in which the G. V. B. Mining Company transacted its business, it can take advantage of its acts against the appellee. We are of opinion that, from the facts, it cannot do so.

As to the power and authority of Bryan, as president, to incur the indebtedness and to give notes in the name of the corporation, but

little need be added to the general observations heretofore stated. Courts must deal with persons and corporations as they find them dealing with each other.    Where the president of a corporation is given full power and authority to conduct and manage its business, and deal with the property and affairs of the corporation in such a manner, and for such a length of time, as to justify others with whom he transacts business in believing that he had authority to do the acts in the manner and way performed by him, the people with whom he transacts business have the right to deal with him upon the assumption that he has such authority; and the corporation, having knowledge of the exercise of such acts, and of the manner in which the corporate business was transacted, cannot thereafter, to the injury and prejudice of such parties, deny his authority, or disaffirm or set aside his acts.    Merchants' Nat. Bank v. State Nat. Bank, 10 Wall. 604, 644; Martin v. Webb, 110 U. S. 7, 3 Sup. Ct. 428; Allen v. Wilson, 28 Fed. 677, 680; Poole v. West Point Butter & Cheese Ass'n, 30 Fed. 513, 520; Johnson v. Insurance Co., 46 Neb. 480, 490, 64 N. W. 1100; Carpey v. Dowdell, 115 Cal. 677, 683, 47 Pac. 695; Union Gold Min. Co. v. Rocky Mountain Nat. Bank, 2 Colo. 248, 257; Illinois Trust & Sav. Bank v. Pacific Ry. Co., 117 Cal. 332, 346, 49 Pac. 197, 202; Fay v. Noble, 12 Cush. 1, 17; Lee v. Mining Co., 56 How. Prac. 373; Calvert v. Stage Co., 25 Or. 412, 36 Pac. 24; Carrigan v. Improvement Co., 6 Wash. 590, 34 Pac. 148; Sparks v. Transfer Co., 104 Mo. 531, 539, 15 S. W. 417.

Moreover, the corporation for several years had the benefit of the money drawn from the bank, and upon divers notes, which were renewed by the notes which the mortgage was given to secure, and cannot, after such length of time, never having made any objection thereto during the transactions, be heard to deny the validity of the same. Union Gold-Mining Co. of Colorado v. Rocky Mountain Nat. Bank, 96 U. S. 640; Pittsburg, C. & St. L. Ry. Co. v. Keokuk & H. B. Co., 131 U. S. 371, 381, 9 Sup. Ct. 770; Construction Co. v. Fitzgerald, 137 U. S. 98, 109, 11 Sup. Ct. 36; Wood v. Waterworks Co., 44 Fed. 147, 150; Railroad Co. v. Kittel, 2 C. C. A. 615, 52 Fed. 63, 73; Railway Co. v. Sidell, 14 C. C. A. 477, 67 Fed. 464, 469; Hardware Co. v. Phalen, 128 Pa. St. 110, 118, 18 Atl. 428; Allen v. Power Co., 13 Wash. 307, 309, 43 Pac. 55; Gribble v. Brewing Co., 100 Cal. 67, 71, 34 Pac. 527; Bradley v. Ballard, 55 Ill. 413, 419.

In Crowley v. Mining Co., 55 Cal. 273, 275, the court said:

"The common-law rule, that a corporation has no capacity to act or to make a contract, except under its common seal, has been long since exploded in this country. Even in England, it has been found to be impracticable, so that the classes of cases which constitute exceptions to the rule have become so numerous that the exceptions have almost abrogated the rule. In the United States, nothing more is requisite than to show the authority of the agent to contract. That authority may be conferred by the corporation at a regular meeting of the directors, or by their separate assent, or by any other mode of their doing such acts."

If this were not so, "it would," as said by Redfield, C. J., in Bank of Middlebury v. Rutland & W. R. Co., 30 Vt. 159, 170, "become impossible to dispose of such contracts with any hope of reaching the truth and justice of the rights and duties of the several parties involved,

and this is certainly nothing of which the corporation can complain. It is merely holding them to such rules of action as they see fit to adopt for their own guidance and the transaction of their business."

In Sherman v. Fitch, 98 Mass. 59, 64, the court, speaking of the authority of the president to execute a mortgage in behalf of the corporation, said:

"It is not necessary that the authority should be given by a formal vote. Such an act by the president and general manager of the business of the corporation, with the knowledge and concurrence of the directors, or with their subsequent and long-continued acquiescence, may properly be regarded as the act of the corporation. Authority in the agent of a corporation may be inferred from the conduct of its officers, or from their knowledge and neglect to make objection, as well as in the case of individuals."

The principal contention of appellant is that, whatever the rule may be as to the indebtedness incurred by Bryan and Venable, while they controlled and managed the property of the corporation, or as to the validity of the notes executed by them as the notes of the corporation, the mortgage is absolutely void, because it was not executed in the manner provided for by the statute of New York, which required, as a condition precedent to the execution of the mortgage, the written assent of two-thirds of the stockholders, in the manner therein provided. Act to Amend Stock Corporation Law, approved May 18, 1892 (Laws N. Y. 1892, vol. 2, c. 688). In support of his contention appellant's counsel cites Vail v. Hamilton, 85 N. Y. 453; Bank v. Averell, 96 N. Y. 467; In re Wendler Mach. Co., 2 App. Div. N. Y. 16, 20, 37 N. Y. Supp. 444; Sugar Co. v. Whitin, 69 N. Y. 328, 333; and Pauling v. Steel Co., 94 N. Y. 334.

In the Vail Case there was no assent given as required by the statute, or in any other manner, and the court held the mortgage to be invalid.

In the Rochester Savings Bank Case, it was held, as in all the cases, that such an assent is an indispensable condition of the creation of a valid mortgage; but, where such assent was not given at the time the mortgage was executed, it would be validated, in the absence of any intervening rights, by a subsequent assent, which would operate as of the time of the execution of the mortgage and make it valid. The court, among other things, said:

"The object of the legislature, in requiring such assent, was the protection of stockholders against improvident, collusive, or unwise acts of the trustees, the governing body of the corporation, in incumbering the corporate property. Sugar Co. v. Whitin, 69 N. Y. 333. That the enactment was in the interest of stockholders is indicated by their designation as the assenting body. * * * The stockholders of a corporation are the equitable owners of the corporate property. The trustees are the managers. * * * The act of 1864 put it in the power of the stockholders to prevent any incumbrance of the corporate property by the act of the trustees alone."

In Sugar Co. v. Whitin the court held that the statute under consideration was intended simply to protect the stockholders from improvident or corrupt acts of the officers of the corporation, and was not enacted because the mortgaging of corporate property was regarded as improper per se. In the course of the opinion, Church, C. J., said:

"Without considering the question whether any but stockholders may interpose the objection to the authority exercised in this case, the inference that the general purpose and design of the act was in the interest of stockholders only, has some bearing upon the question presented as to the proper rule of construction to be adopted of the paper produced as an assent of the stockholders. The officers of a corporation are the agents of the stockholders, who occupy, in some respects, the character and position of principals, and this relation is recognized in the act in question, permitting the mortgaging of corporate property. The officers were prohibited from mortgaging, but may do it with the consent of the stockholders. The act of mortgaging is not deemed illegal; but the principal must assent in writing, and, to make the provision of practical value, the difficulty of procuring the assent of every stockholder was avoided by permitting the owner of two-thirds to assent. It is important to observe that the statute does not prescribe any particular form of assent, nor what it shall specify or contain. It only requires an assent in writing to secure a debt by mortgage. The statute should receive a practical, and not a technical, construction, and especially in the absence of fraud, and in the absence of any objection on the part of those for whose benefit the proviso was inserted, we are not called upon to exercise great astuteness in discovering defects which are not of such a substantial and radical character as to render the assent ineffective for the purpose designed. * * * He [appellant] seeks to gain a preference, not by objecting either that the amount of the debt or its nature was not correct and legitimate, nor claiming that he was in manner deceived or misled, but by criticising the form in which those interested saw fit to express their assent. Assuming his right to object, we think the defects must be so radical that an intention to consent cannot be inferred."

In Pauling v. Steel Co., the court, referring to Sugar Co. v. Whitin, said:

"It is, at least, doubtful whether anybody but stockholders can complain that the condition was not complied with."

The mortgage in the present case was executed by the "G. V. B. Mining Co. [L. S.], by G. V. Bryan, President," and indorsed thereon is the following: "I hereby assent to the making of the mortgage. G. W. Venable." Bryan and Venable, be it remembered, at that time owned more than two-thirds of the stock of the corporation. In fact, they owned all the stock except 352 shares, as shown by the preponderance of the evidence given at the trial. Following the reason and spirit of the decisions in the state of New York, we think the acts of Bryan and Venable, in the absence of any allegation or proof of fraud upon their part, constituted a substantial compliance with the statute, and that the corporation is not in a position to make any objection thereto upon this ground.

It is next claimed that the mortgage is not the deed of the corporation, because the seal thereto affixed by Bryan is not its corporate seal. The by-laws of the corporation provide that "the trustees shall provide a seal, with a suitable device, and containing thereon the corporate name of the company, which shall be in charge of the secretary or treasurer, and said seal shall be affixed to all certificates of stock, and to such contracts and agreements as is required by law." The mortgage in the present case closes with the words: "In testimony whereof, the said party of the first part, by G. V. Bryan, its president, has hereunto subscribed its name, and affixed its corporate seal, the day and year first above written." There are several authorities which hold that, in the execution of important contracts, deeds, and mortgages by a corporation, it is essential that the corporate seal

should be attached. Many of these cases are based upon the doctrine which prevailed in former times, when the use of seals containing devices symbolical of the individual or corporation to which they belonged was quite common. These cases are akin to others which, for many years, declared that a seal must be impressed on wax, wafer, or some other adhesive or tenacious substance, instead of being impressed on paper; in regard to which Mr. Justice Grier, in Pillow v. Roberts, 13 How. 472, 474, said: "It is time that such objections to the validity of seals should cease." But this admonition not having produced the effect suggested, the legislature of several of the states have enacted statutes providing just what kind of seals shall be used and how they shall be affixed. In others the use of the seal has been dispensed with. Of course, in such states, the statute governs. While it is always safer for a corporation to use its corporate seal, if one has been adopted, in order to avoid objections, yet its use is not absolutely necessary to the validity of the instrument. As was said by the court in Ford v. Hill (Wis.) 66 N. W. 115, 118:

"The old doctrine that corporations can act only by deed or instrument under seal has been very much modified. It has given way to the pressure put upon it by the great growth of corporate transactions, and the necessity for greater freedom in their operations for the convenience of business."

Where an instrument, which requires a seal, is in all other respects properly signed and executed, it should not be declared invalid because the corporate seal was not attached, where, as here, it affirmatively appears that the "[L. S.]" was adopted and used for the occasion as the seal of the corporation. Bank of Middlebury v. Rutland & W. R. Co., 30 Vt. 159, 171; Thayer v. Mill Co., 31 Or. 437, 444, 51 Pac. 202; 1 Mor. Priv. Corp. (2d Ed.) § 339; 2 Cook, Stock, Stockh. & Corp. Law (3d Ed.) § 722; B. S. Green Co. v. Blodgett, 159 Ill. 169, 174, 42 N. E. 176; Proprietors, etc., v. Hovey, 21 Pick. 417, 428; Porter v. Railroad Co., 37 Me. 349; Eureka Co. v. Bailey Co., 11 Wall. 488, 491; Navigation Co. v. Hooper, 160 U. S. 514, 518, 16 Sup. Ct. 379; Tenney v. Lumber Co., 43 N. H. 343, 350; Johnston v. Crawley, 25 Ga. 316, 326; 1 Devl. Deeds, § 337.

A contract of a corporation which is ultra vires is something outside the object of its creation, as defined in the law of its organization, and therefore beyond the powers conferred upon it by the legislature. Such a contract is not voidable only, but wholly void, and of no legal effect. The objection to the contract is, not merely that the corporation ought not to have made it, but that it could not make it. The contract cannot be ratified by either party, because it could not have been authorized by either. No performance on either side could give the unlawful contract any validity, or be the foundation of any right of action upon it. But, when a corporation is acting within the general scope of the powers conferred upon it by the legislature, the corporation, as well as persons contracting with it, may be estopped to deny that it has complied with the legal formalities which are prerequisites to its existence, or to its action, because such requisites might in fact have been complied with. The doctrine of ultra vires has been often said to rest upon three distinct grounds: (1) The obligation of persons dealing with a corporation to take notice

of the legal limits of its powers; (2) the interests of the stockholders not to be subjected to risks which they have never undertaken; and (3) the interest of the public that the corporation shall not transcend the powers conferred upon it by law. The authorities bearing upon these general principles are well settled, and are clearly stated in Central Transp. Co. v. Pullman's Palace-Car Co., 139 U. S. 24, 59, 11 Sup. Ct. 478, and Bank v. Kennedy, 167 U. S. 362, 368, 17 Sup. Ct. 831, and in the numerous authorities there cited. It is manifest therefrom, as well as from the principles hereinbefore announced and hereinafter stated, that the doctrine of ultra vires has no application to this case. The corporation, as we have already shown, had the unquestioned authority and power, under the law, to execute the notes and mortgage in question, and it cannot, therefore, be claimed that their execution by the president was ultra vires. The stockholders are bound by their consent, as well as by their failure to make objections, to the manner in which the business was transacted, and the parties with whom the corporation transacted its business had the right to believe that it was not exceeding its powers. The general public are not interested in this suit.

In McCracken v. Robison, 6 C. C. A. 400, 57 Fed. 375, 377, the court held that directors who own all the stock of a corporation are not within the rule prohibiting persons in a fiduciary relation from contracting for their own advantage in the name of the beneficiary, and such a contract, made in the name of the corporation by the unanimous consent of the directors, is not invalid, as against public policy. Among other things, the court said:

"The defendants, by confounding names with things and form with substance, have built up a theory to shelter themselves from performing their own part of the contract, which is as unsound as their own conduct is dishonest."

In Barr v. Railroad Co., 125 N. Y. 263, 273, 26 N. E. 145, the court, among many other things applicable to this case, said:

"If the company's directors were interested in the work and profits of construction, and evaded a direct contract through the form or device of an intermediary contractor, that was a matter for the company or for its stockholders to take hold of; but the stockholders and the members of the syndicate were the same persons, and, however wrong the transaction might be if other persons were concerned, here no injury was effected to any one interested in the corporation, and, however illegal the transaction, there was no person apparently to complain of it."

See, also, Wood v. Waterworks Co., 44 Fed. 146, 151, and authorities there cited.

It is evident that neither Bryan nor Venable, if they had continued in charge of the corporation, could be heard to say that their acts were illegal, without authority of law, and wholly void. It cannot consistently be said that the acts of the Thurber faction stand in any better light. When they took charge of the mines on July 11, 1895, which was within a month after the execution of the mortgage in question, they apparently endeavored to be honest and just to all parties concerned. They continued working under the lease and agreements referred to in the foregoing statement up to October 6, 1897, with full knowledge of all the facts, without interposing any objection to the manner in which the indebtedness was incurred and

mortgage executed. Then, when they found they would not be able to pay the debts of the corporation, as they had agreed to do and partially did, they determined to take advantage, if they could, of all the acts of Bryan, and, with Venable's willing assistance, save something for themselves from the general wreck, and to this end they procured their directors to pass a resolution "condemning as unauthorized the notes and mortgage in this suit, and empowering the president [Thurber] to resist this action," and by this means they have endeavored to shield themselves from all wrong under the guise of the innocent name of the corporation. As against the appellee herein, they have no superior equity, and the corporate name ought not to be used, and cannot be used, for the purpose of avoiding the payment of the debts of the corporation incurred under conditions which made the corporation liable. To so hold would lead to frauds innumerable. However improper, illegal, or unwarranted Bryan's conduct may have been, it is transparent that he has been distanced in the race by his competitor Thurber, and that the corporation will have to bear the sins of both.

There is but one other point to notice. No testimony seems to have been offered upon the allegation in the complaint concerning the alleged mistake in the description of the property mortgaged, and the decree declares that this alleged error is "corrected to conform to the intent of the parties to said mortgage as to the premises and property which should be mortgaged thereby." It is claimed that the mortgage expressly covered the group by name, and that, under the allegations, must have covered the Sumol claim in question; that the answer simply denies that any mistake was made, and did not deny that the Sumol was a part of the group; and that it was therefore unnecessary to prove the facts alleged in the complaint. The objection to this part of the decree was raised for the first time on appeal, and the court might for this reason be justified in not considering it; but inasmuch as the appellee "offered to release it from the effect of the decree," and as it is stated in the brief that it "was written into the decree through inadvertence," we are of opinion that the decree should be modified by striking out the order and description herein referred to, but that this correction should not affect the right of appellee to recover its costs. The decree, as modified, is affirmed, with costs.