No. 21,761.

M. A. GORRILL, on Behalf of Himself and all other Stockholders of the THE CHELSEA OIL AND GAS COMPANY similarly situated, *Appellant,* v. JOHN ROBERT GREENLEES, ARTEMUS WELSH, and THE CHELSEA OIL AND GAS COMPANY, *Appellees.*

SYLLABUS BY THE COURT.

1. ACTION—*Recovery of Money—Proper Party Plaintiff.* The pleading and proof were sufficient on their face to enable the plaintiff to bring this action.

2. CORPORATION—*Directors' Meeting—Notice.* Ordinarily, a directors' meeting, to be binding, must be a regular one, of which the directors have general notice, or a special one, upon due notice to each.

3. SAME—*Directors' Meeting—Presumption of Regularity.* Generally, the transaction of corporate business at a meeting of the directors, or a quorum thereof, raises the presumption of due notice properly given, but when the governing body—the directors—acts for the corporation, the result must be determined, not by the degree of formality observed, but by the practical and legal effect of such action.

4. SAME—*Agreement—By Majority of Directors—Acquiscence for Three Years—Agreement Ratified.* A majority of the directors of a corporation which had made a certain escrow agreement with an agent to sell all its stock and assets on certain terms, at an informal meeting, without notice to the others, directed that the property be turned over by the agent to a purchaser on making a first payment, contrary to the terms of the escrow agreement. This direction was followed; the stockholders received and retained four payments on the purchase price, aggregating about two-thirds thereof, and also received and retained certain shares of stock put up as collateral to secure the payment of the purchase price. For nearly three years no director objected to what had been done. *Held,* that by this course of conduct the corporation acquiesced in, and ratified, such action of the majority of its directors, and could not hold such selling agent liable on the original escrow agreement.

5. SAME—*Stockholder Not Entitled to Maintain Action.* The plaintiff, a stockholder, being bound by the action and acquiescence of the corporation, cannot maintain an action—upon the refusal of the directors

to· sue—to hold the selling agent for the unpaid balance of the purchase price, under the original escrow agreement.

6. TRIAL WITHOUT JURY—*Improper Evidence—Presumptions.* In a trial by the court, without a jury, it is to be presumed that no improper evidence was permitted to materially affect the result.

7. NEW TRIAL—*Properly Denied.* The affidavits in support of a motion for a new trial failed to show such accident, suprise and diligence as to require the granting of a new trial.

Appeal from Douglas district court; CHARLES A. SMART, judge. Opinion filed May 10, 1919. Affirmed.

*M. A. Gorrill,* and *Henry H. Asher,* both of Lawrence, for the appellant.

*S. D. Bishop,* and *W. E. Emick,* both of Lawrence, for the appellees.

The opinion of the court was delivered by

WEST, J.: The Chelsea Oil and Gas Company was organized under the laws of Arizona, capitalized at $1,000,000, divided into one million shares. Mr. Greenless was one of the organizers and one of the largest stockholders, but by 1912 he had transferred his holdings and was not a stockholder or director. He had organized or assisted in organizing four or five other oil companies, and negotiations were had looking to a sale of all these properties to an English syndicate; and, after various attempts and failures, an arrangement was made by which the companies were to be taken over, the price for the Chelsea company's holdings being $70,000, less two and one-half per cent commission, 30 per cent to be paid within ten days, one-half of the remainder in six months, and the other half in one year. August 22, 1912, Mr. Greenlees signed a receipt to W. P. Graff, secretary and treasurer of the Chelsea company, for certain evidences of title:

"Same to be held in joint possession of me, the said J. R. Greenlees and Price-Waterhouse Company in escrow to be delivered to a purchaser upon the payment of $70,000.00 less 2½%. . . . In case said payments are not made as above mentioned evidences of title to be returned to said W. P. Graff."

On the next day he signed another receipt with similar recitals, but to the clause touching the payment of the items making up the $70,000 less commission, there was added:

Gorrill v. Greenlees.

"With the right of possession in the purchasers upon the ma i.g of the first payment; and the evidences of title to be held in escr w until the payment of the entire consideration, with interest. . . ."

The remainder of this receipt was as follows:

"Whereas the Board of Directors of the said Oil and Gas Company, by resolution, duly adopted August 22, 1912, aforesaid, authorized and empowered its president and secretary to dispose of the said property after ratification of said resolution by the holders of all stock of said company. Now, therefore, this supplementary receipt from said J. R. Greenlees to W. P. Graff, secretary, witnesseth, that the evidence of title of the said Chelsea Oil and Gas Company and the resolution aforesaid are delivered to said J. R. Greenlees, to be placed in escrow, in accordance with an escrow agreement, to be duly executed, on condition that in case default be made by the purchasers of said property in the payment of the first installment ᴕ the consideration money above mentioned, for a period of ten days after the same shall become due, then all title and all other papers of said company shall be surr rdered and the agreement of sale shall terminate forthwith; and if the ist installment shall be paid and default be made in the payment of eith the second or third installments of said purchase money for a period f thirty days after the same shall become due, as aforesaid, then up i either such default the purchasers shall surrender to said Chelsea Oil nd Gas Company immediate possession of said property, and its sai evidence of title shall be delivered to it from escrow, and the amount already paid to said company on account of the purchase money shall be forfeited as liquidated damages.                    (Signed)    J. R. GREENLEES."

Ratification of this action by the stockholders was evidenced by their sending in to the secretary their certificates duly assigned. The resolution of the directors, of August 22, empowered the president and secretary to sell and dispose of all the property to Greenlees, trustee, for $70,000, less two and one-half per cent commission, cash or its equivalent, "and on such terms as to delivery and payment as to the said president and secretary shall seem meet." As finally arranged, the purchasing syndicate was to pay 50,000 pounds cash when the properties were transferred, 25,000 pounds in thirty days, one-half of the remainder in six months, and the other half in twelve months, for which deferred payments personal shares of the syndicate stock were to be deposited as security. When this ten days' time mentioned in the receipts had expired, the syndicate was not prepared to pay. In October, Mr. Greenlees went to London to close matters, and finally succeeded. He wired the officers of the Chelsea company to meet him at Blairs-

ville, Pa., one of its two places of business, and there a majority of the directors met him and were advised that the syndicate would not pay over any money until the transfer was made and the properties put in its possession. They directed him to turn over the Chelsea property and get the money due the company. This was done, and four installments of the purchase price were paid, as follows:

| | |
|---|---:|
| "October 24, 1912 | $15,000.00 |
| November 4, 1912 | 5,800.33 |
| April 3, 1913 | 15,000.00 |
| August 4, 1913 | 8,899.50" |
| Total | $44,699.83 |

On default of subsequent payments the shares of stock in the syndicate which had been put up as collateral were delivered to the secretary and treasurer of the Chelsea company.

The plaintiff, M. A. Gorrill, brought this suit on behalf of himself, a large stockholder, and all the other stockholders of the company similarly situated, to recover a claimed balance of the $70,000.

In the first cause of action he averred that after the default of the payments, Greenlees failed and refused to return to the company its leases, thereby damaging the stockholders $70,000; and that since the default, he had made certain partial payments of $44,699.83, leaving a balance due the company of $24,300.17, with interest.

In the second cause of action he alleged that Greenlees sold the property of the oil company, but refused to pay, except $44,699.83, and prayed judgment for the balance, with interest on each count.

The answer challenged Gorrill's legal capacity to sue, denied his allegations generally, and pleaded that the conditions set forth in the two escrow receipts, already referred to, were waived by the Chelsea company, and that Greenlees was authorized and directed by the company, through its officers, stockholders, and agents, to dispose of its property as he had done.

In his reply, the plaintiff denied the defendant's allegations, denied the authority of Greenlees, and especially denied that he, Gorrill, as a stockholder, had at any time, directly or indirectly, authorized the disposition made of the property.

At the close of the trial the court rendered judgment for the defendant. The plaintiff moved for a new trial, supporting the motion by affidavits. This motion was overruled, and the plaintiff appeals, claiming that the court erred in receiving improper evidence, and in refusing a new trial.

The notice sent out to the stockholders was to the effect that the entire holdings had been sold for $68,250, of which 30 per cent had been paid, and that one-half the balance was to be paid in six months, and the other half in twelve months. In 1915, the plaintiff wrote to the directors demanding that they proceed to collect the balance due from Mr. Greenlees, but no action was taken.

There was evidence on the part of the defendant to the effect that when he sent the check for $8,899.50, August 4, 1913, he did not at that time have the money from the English people to cover this check, but, in fact, advanced it out of his own funds; that he went to London to make collection from the English people, and was there about six months, but was unable to collect any money; that he took down the preferred shares of stock which had been put in the bank as collateral, and sent them to the companies in their proportionate shares; and that he had since brought suit against the English company, asking judgment for the purchase money.

Several of the directors testified as to the meeting at Blairsville, and to their dealings with Greenlees touching the sale of the property, and that it was agreed to turn over the stock.

The pleading and proof were sufficient on their face to enable the plaintiff to bring this action. (*A. T. & S. F. Rld. Co. v. Comm'rs of Sumner Co.*, 51 Kan. 617, 33 Pac. 312; *Fitzwater v. Bank*, 62 Kan. 163, 61 Pac. 684; *Fry v. Rush*, 63 Kan. 429, 65 Pac. 701; Note, 51 L. R. A., n. s., 99.)

The chief point turns on the effect to be given the meeting or meetings at Blairsville and what followed. While it seems that a deposition was taken by the defendant to show that a record of these meetings was made, the deposition was not offered in evidence.

Ordinarily, a directors' meeting, to be binding, must be a regular one, of which the directors have general notice, or a special one, upon due notice to each. Another rule quite well recognized is, the transaction of corporate business at a meet-

ing of the directors, or a quorum thereof, raises the presumption of due notice properly given; but there is no need for niceties here, for the evidence is quite convincing that there was no technical regularity about the Blairsville meetings. The directors, or a majority, were present and assumed to act for the Chelsea company. The terms of the escrow receipts had already become impossible of performance, and a practical question presented itself—whether to let the sale fall through or to direct the defendant to turn over the assets under the terms of the deal he had effected with the syndicate. He was directed to deliver the property, and get the proceeds. The first he did, and the second he did to the extent of more than $44,000, in addition to a large number of collateral shares in the syndicate, the value of which does not appear. Neither the plaintiff nor any other stockholder refused to accept, or offered to return, any of the four payments received, or staggered at his right to retain them.

There seems to have been no intention to treat or hold the defendant as purchaser, or other than as a selling agent. In November, 1912, the seal, minute book and stock book and a list of the stock certificates were sent to St. Louis to a representative of the purchasing syndicate. W. P. Graff was secretary and treasurer of the Chelsea company, but he delegated his duties as such to his brother, F. M. Graff, who attended to the meetings and represented and looked after the interests of his brother, W. P. Graff. F. M. Graff testified that he was given authority to act for the company in all the transactions involved herein.

"The authority to act for the company was given me repeatedly, orally, the same as other instruction for certain actions. I paid the bills, negotiated loans, made contracts for oil and managed the general affairs of the company. I knew that Mr. Greenlees was negotiating a sale with an English syndicate . . . Mr. Greenlees acted as the agent or go-between in these dealings between the company. Mr. Greenlees was given practically full authority to handle these transactions. . . . While we realized that we were getting a pretty good price for these properties and gave him latitude in the matter of handling the proposition, it was a long-range business deal and we could not be at his elbow at every instance and he being largely interested we allowed him to handle the matter pretty much as the case developed. I do not know if there was ever any written authority for him to act. . . . Under the agreement all understanding between the Chelsea

Gorrill v. Greenlees.

Oil & Gas Company and Mr. Greenlees, there was nothing in this understanding to the effect that the company or stockholders were to receive anything until Mr. Greenlees received his payment from the two English companies."

He further testified that all the certificates were forwarded to the St. Louis agent of the syndicate, Mr. Angert, "and the company automatically dissolved," and after that he acted as agent or representative of the former stockholders. To him were transmitted the payments which he distributed to the stockholders, and to him, also, were sent the collateral syndicate shares for the benefit of the stockholders.

A corporation is, after all, but a human concern and, like natural persons, is often bound by conduct which has not followed the beaten path of technical formality. If the governing body—the directors—act for the corporation, the result must be governed, not by the degree of formality observed, but by the practical and legal effect of such action. The Chelsea company had concluded to sell out its entire stock and assets, and cease business as a going concern. It did so, all the stockholders sending in their certificates to the end that this scheme could be carried out. The defendant had been employed to effect the sale, and the stock and assets were turned over to him for delivery. The books, records and seal were, like the stock and assets, turned over to the purchasing syndicate, or its agent. When it was found that the sale indicated by the wording of the escrow receipts could not be consummated, but that a sale could be made by turning over the property to the purchaser, the Chelsea Oil and Gas Company had practically ceased to do business. True, it had not dissolved and was still subject to rejuvenation as a business enterprise, but, as a matter of fact, it regarded itself as having accomplished its mission by having sold its entire stock and assets at what the acting secretary and treasurer testified was deemed a pretty good price. When the word came to the directors from Mr. Greenlees, on his return from London, that the sale could not go through unless the property could be delivered to the purchaser, a meeting could have been noticed and called, so that the entire board of directors could have had an opportunity to meet; but, instead, a majority who did come directed the property to be delivered and the pur-

chase price to be collected, and the acting secretary and treasurer, who had been and still continued to be active in looking after the affairs of the concern, carried out these instructions. Those absent did not complain or find any fault with what the majority did, and were very likely satisfied therewith. There is nothing to indicate that anything could have been received had not the directions been followed to deliver the property to the syndicate; nor is there anything to indicate, or any claim made, that any one acted in bad faith, or that there was any attempt to wrong or overreach any stockholder, or that any such result occurred. A majority of the directors had already acted and were not in condition to bring suit against a man whom they regarded as an agent of the company, and not as a purchaser; and those who had not acted had no fault to find and no suit to bring, and so it came about that the plaintiff, as the only one of the entire board of directors and stockholders, felt that the defendant should be held liable under his escrow receipts for the balance which remained unpaid by the purchasing syndicate.

His chief reliance is on the proposition that the Blairsville meeting or meetings were not binding on the corporation, and, therefore, not binding on the stockholders, because not regular, and because not properly noticed. No case has been cited or found that fits the facts here presented, but cases have arisen in which the absence of formality and failure to follow the ordinary rules of technicality by corporations did not relieve them from liability. In *National Bank v. Shumway*, 49 Kan. 224, 30 Pac. 411, it appears that three of the directors of the plaintiff bank were nonresidents: one had sold his stock and had had nothing to do with the bank for several years; another was a traveling man, his whereabouts unknown; and the third lived in another state, and was inaccessible for immediate notice. The remaining directors, being a quorum, called a meeting and passed resolutions authorizing an assignment for the benefit of creditors. Afterwards, two of the absent directors recognized the assignment, and it was said: "Under all the circumstances the deed of assignment cannot be declared to be wholly void." (syl.) In *G. V. B. Min. Co. v. First Nat. Bank*, 95 Fed. 23, the ninth circuit court of appeals decided:

Gorrill v. Greenlees.

"Where the business of a corporation has habitually been transacted in an irregular manner, without observing the formalities legally required to bind it, with the knowledge and acquiescence of its stockholders, and it has in such manner made contracts and incurred obligations, the strict rules of law, however well settled, limiting the mode of exercising the powers of corporations by their officers, are not applicable to such contracts, as against third parties who have dealt with the corporation in good faith, and with knowledge of its manner of doing business."     (syl. ¶ 1.)

From the numerous authorities quoted in this decision, we quote a sentence from each of two:

"In the United States, nothing more is requisite than to show the authority of the agent to contract. That authority may be conferred by the corporation at a regular meeting of the directors, or by their separate assent, or by any other mode of their doing such acts." (*Crowley v. Genesee Mining Co.*, 55 Cal. 273, 275, 95 Fed. 30.)

"It is not necessary that the authority [to make a mortgage] should be given by a formal vote. . Such an act by the president and general manager of the business of the corporation, with the knowledge and concurrence of the directors, or with their subsequent and long-continued acquiescence, may properly be regarded as the act of the corporation. Authority in the agent of a corporation may be inferred from the conduct of its officers, or from their knowledge and neglect to make objection, as well as in the case of individuals." (*Sherman and another v. Fitch*, 98 Mass. 59, 64, 95 Fed. 31.)

Cook on Corporations, volume three, seventh edition, section 713*a*, states the rule thus, with citations of numerous authorities:

"The law is inclined to tolerate more freedom in the notice and the calling and holding of directors' meetings, inasmuch as the meetings are more frequent, the absences more common, the acts less fundamental, and ratification by acting on the contracts more certain and easy. Acquiescence in the action of a board, even if not legally convened, has frequently been held sufficient to legalize such action. Thus where there are three directors and one of them is a non-resident, a pledge of bonds authorized at a directors' meeting, of which the non-resident director has no notice, is nevertheless valid where for two years the corporation has not complained. A preference given by a meeting of the board of directors at which a quorum is present, notice of which was not given to the other directors, may be valid if no officer or stockholder thereafter objected to the same. . . . Where five of eight members of the board of an insolvent company meet and authorize the sale of certain personal property, and such sale is carried out, other creditors cannot raise the objection that no notice was given to the remaining three members of the board."

Under all the circumstances, the corporation itself could not maintain this action on account of its own acts and acqui-escence and that of its directors. The plaintiff, being a stock-holder and bound by the action of the corporation and its deal-ings with the defendant, cannot on his own account change the relation of the defendant from that of selling agent to that of purchaser and hold him liable for the unpaid balance due from the purchasing syndicate.

Certain things were permitted to be testified to orally, over objection, because said to be in writing. The record or docu-ment itself was the best evidence. This had to do with certain cables, telegrams and actions of the directors' meetings, but as the trial was before the court without a jury, it is to be presumed that no improper evidence was permitted to ma-terially affect the result. (*McCready v. Crane,* 74 Kan. 710, 88 Pac. 748; *Kimball v. Edwards,* 91 Kan. 298, 137 Pac. 948; *Sipe v. Sipe,* 102 Kan. 742, 173 Pac. 13.)

The motion for a new trial and the affidavits in support thereof failed to show such accident, surprise and diligence as required the granting of a new trial.

There was evidence to sustain the judgment and, no material error appearing, such judgment is affirmed.