ROSE I. DOEHLER, Plaintiff, *v.* THE REAL ESTATE BOARD OF NEW YORK BUILDING CO., INC., and Others, Defendants.

Supreme Court, New York County, February 24, 1934.

*Lewis, Marks & Kanter*, for the plaintiff.

*Allin, Tucker & Allen* [*Yorke Allen* of counsel], for the defendants Title Guarantee and Trust Company and others.

*Harold J. Treanor*, for the defendants The Real Estate Board of New York Building Co., Inc., and others.

*Frueauff, Robinson & Sloan* [*James P. Farrell* of counsel], for the defendants Charles A. Frueauff and another, as executors of Irving Walsh, deceased.

ROSENMAN, J. The Real Estate Board of New York Building Co., Inc. (hereinafter referred to as the building company) was the lessee of premises No. 5 East Fortieth street, in New York city, under a lease from the plaintiff for a term from May 1, 1925, to April 30, 1947. The building was owned by the plaintiff. It was an office building and offices therein were sublet by the building company to various tenants.

As months of economic depression continued, the rents received by the building company began to fall below the rental payable to the plaintiff by the building company. The assets of the building company were being gradually depleted by reason of these losses sustained month after month.

Negotiations with the plaintiff were undertaken by the building company looking to some new arrangement with reference to the lease. These negotiations did not materialize. The monthly rent due June 1, 1932, was not paid. The monthly rent due July 1, 1932, was not paid. The total of these two months unpaid rent was $2,442. On July 12, 1932, the plaintiff commenced a summary proceeding against the defendant for non-payment of this rent, asking for a money judgment therefor in addition to possession of the demised premises. On July 22, 1932, a final order of dispossess was granted and a judgment was entered in favor of plaintiff

against the building company in the sum of $2,448.85. This judgment was docketed in the county clerk's office of New York county on July 26, 1932. On August 19, 1932, the plaintiff, as a judgment creditor, commenced a sequestration action against the building company in which a temporary receiver was appointed on September 16, 1932.

The building company was the owner of the fee of premises No. 10 East Forty-first street. On these premises there was a first mortgage held by the Mutual Life Insurance Company in the principal amount of $845,000. Junior to this first mortgage was a second mortgage in the principal sum of $600,000. This second mortgage was covered by a deed of trust to the Title Guarantee and Trust Company as trustee. Against this second mortgage and deed of trust, bonds had been sold to the public generally for the full amount of $600,000. All of the $600,000 received from the sale of these bonds had been spent in constructing the building against which they were issued.

During the more prosperous years of the building company, between December, 1929, and February, 1931, it had gone into the open market and had bought $55,000 of these bonds from its own surplus. It held them in a custodial account with the National City Bank. The National City Bank would clip the coupons when they became due and would deposit them to the credit of the account of the building company. The $55,000 of bonds were carried on the books of the building company as an asset, although they were in effect obligations of the company itself.

After the commencement of the sequestration action by the plaintiff and before the appointment of the temporary receiver in that action, this present suit was commenced against the building company, its directors and the Title Guarantee and Trust Company. The purpose of it is to set aside certain transfers of assets of the building company made by its directors to various transferees, including the Title Guarantee and Trust Company. It arises out of the following circumstances:

On June 30, 1932, a meeting of the board of directors of the building company was called for the purpose of taking action with reference to its liabilities and financial condition.

The interest on the second mortgage bonds had been paid up to June 30, 1932. On the following day, however, a semi-annual interest payment was to become due and there were insufficient funds on hand to meet this payment. The amount of interest to become due was $21,000, less $1,925, interest on the $55,000 of bonds owned by the building company itself. This interest was not paid, and has not been paid to date.

.The directors at the meeting of June 30, 1932, took the following action by formal resolution: (1) They assigned to the Title Guarantee and Trust Company, as trustee for the bondholders, all the rents receivable from subtenants of the premises No. 10 East Forty-first street; (2) they turned over the $55,000 of second mortgage bonds, which they had purchased out of surplus, to the Title Guarantee and Trust Company, the trustee, with directions that they be destroyed; (3) they authorized the payment to the city of New York of the taxes for the second half of the year 1932 which were to become a lien on the premises No. 10 East Forty-first street on November 1, 1932, amounting to $17,515.84.

These taxes were actually paid the next day, July 1, 1932, and a discount was obtained from the city for this premature payment. Since the building company had only $15,534.79 cash, it was forced to obtain from its agents an advance on the rents to be collected from the premises No. 5 East Fortieth street for July, 1932, in order to obtain sufficient funds to pay these taxes. The taxes had never been prepaid by the building company in this manner before.

The $55,000 of bonds were delivered to the Title Guarantee and Trust Company on June 30, 1932, and were on the next day destroyed.

Before the meeting of June 30, 1932, and after negotiations with the plaintiff with reference to the lease on No. 5 East Fortieth street premises had proven unsuccessful, a committee of the directors called a meeting of the second mortgage bondholders for June 21, 1932, to consider the financial condition of the building and of the company. This was called in contemplation of the inevitable default in interest which was to occur on June thirtieth. Notices were sent out to all of the bondholders whose names could be obtained, and a number of of them, variously estimated as between fifty and seventy-five, appeared. At that meeting the bondholders present elected a committee to represent them.

At the meeting of the board of directors held on June 30, 1932, a representative of the bondholders' committee was present and requested an assignment of the rents. There were also present two lawyers, and legal advice was sought from them by the directors as to the propriety and legality of the action contemplated by the directors. The advice given was that the proposed action was proper in all respects.

The sole business of the building company was the managing of these two buildings, 5 East Fortieth street as a lessee landlord, and 10 East Forty-first street as owner. It is clear that there was no available market on June 30, 1932, for the building owned by the building company. No foreclosures have as yet been commenced

against it either on the first mortgage or the second mortgage, and there are no judgments against the building company other than the plaintiff's. The directors' meeting of June 30, 1932, was followed immediately thereafter by a stockholders' meeting; and the action taken by the board of directors was ratified and confirmed by the stockholders' meeting.

All of the directors who are joined as defendants were present at the meeting of June thirtieth, except the defendants Trunk and McGuire. Defendant Trunk, although absent, signed a waiver of notice of the meeting, dated June 30, 1932, and testified that he knew of the action of the meeting. Director McGuire was not at the meeting, did not authorize any one to sign a waiver for him, and did not know that a waiver had been signed for him by an unauthorized person. At the close of the trial the cause of action was dismissed against the defendant McGuire.

The original order of September 16, 1932, appointing the receiver of the building company in sequestration proceedings, included, *inter alia*, the rents from the premises 10 East Forty-first street. This order obviously conflicted with the assignment of rents to the Title Guarantee and Trust Company for the benefit of the second mortgage bondholders. An application was made to modify the sequestration order. It was modified on October 25, 1932, so as to exclude the rents from premises 10 East Forty-first street, and so as to reserve the question of ownership of these rents to be determined by further proceedings. The sequestration action has not yet continued to judgment.

In addition to the interest which was to become due on the second mortgage on July 1, 1932, there had already been a default on the second mortgage by reason of the failure to pay a $5,000 installment of principal due on the first mortgage on June 1, 1932. There was, however, a thirty-day grace period for this payment which would expire on June 30, 1932, and no action had been taken by the first mortgagee on this default. As a matter of fact the building company had requested a waiver of this amortization payment, which was not waived, however, until July 7, 1932.

The plaintiff complains of the three actions of the building company taken by its board of directors at the meeting of June 30, 1932, alleging them to be fraudulent against her as a creditor under article 10 of the Debtor and Creditor Law, or, in the alternative, preferential as against her, under section 15 of the Stock Corporation Law. The relief asked is that they be set aside and that the plaintiff recover damages against the directors who participated in these transfers for the loss sustained by her by reason of them.

I find that the cremation of the $55,000 of bonds had no effect

legally, either to defraud any creditor or to create an unlawful preference. These bonds were originally the obligations of the building company itself. They had been purchased by it out of its surplus, and consequently had no longer any legal effect as obligations of the building company. The purchase of these bonds had merely reduced the amount of the second mortgage and had increased the amount of the equity. The result was the same as though only $545,000 of bonds had been originally sold and $55,000 had remained unsold, or as though the second mortgage had been reduced by the payment of $55,000 of the principal. It cannot be maintained that these bonds are to be treated as secured obligations, and that unsecured creditors are to be entitled to seize them and participate with other second mortgage bondholders in the security of the second mortgage. Such conclusion would permit general creditors to become secured creditors at the expense of the other secured creditors. If the mortgaged premises were sold at foreclosure and the corporation should seek to share in the proceeds of the foreclosure sale because of its ownership of these bonds, other bondholders could obviously interpose valid objection to it. Apart from the difficulty of the court ordering a reissue of these destroyed bonds, in the absence of the other bondholders whose interests would be adversely affected, the logical method of treating the destruction of the $55,000 is to regard the mortgage as having been reduced by that amount or to treat the bonds as though they had not been issued. To permit the plaintiff to obtain title to these bonds would give the plaintiff herself a preference. The circumstance that the building company itself treated these bonds as an asset should not be conclusive. It was a bookkeeping entry to have the custodian deposit the interest coupons to the credit of the building company, on the one hand, and on the other hand, have the building company pay the interest thereon.

The destruction of the bonds was neither a fraud on general creditors nor a preferred transfer against them. Its only effect was physically to destroy the evidences of an obligation which, until a resale of the bonds, did not exist. The relief requested that these bonds be reissued and applied to the payment of the plaintiff's claim, is denied .

Were the assignment of rents and the prepayment of taxes violative of article 10 of the Debtor and Creditor Law?

The argument of the defendant that the article does not apply to corporations but only to individual persons cannot be maintained. Section 37 of the General Construction Law provides that the term " person " includes a corporation.

I conclude, however, that there was no intention here to hinder,

delay or defraud creditors as contemplated in the Debtor and Creditor Law. The intention of the directors at this meeting was obvious. To continue to pay the rent reserved for premises No. 5 East Fortieth street and the obligations under the first and second mortgages on the premises No. 10 East Forty-first street was no longer possible. Defaults were inevitable, and it was apparent that foreclosures would result. A judgment for rent was also imminent. The directors, as experienced real estate men, knew that a foreclosure would result in the first mortgagee taking over the property and depriving all other creditors of satisfaction of their claims. There was clearly no intention on the part of the building company or on the part of its directors to obtain any benefit, secret or otherwise, for the company or for any of the directors. There was no desire to perpetrate any actual fraud. The directors were actuated solely by a desire to tide over the situation as well as possible, by preventing foreclosure and maintaining the *status quo* as long as they could. The sections of article 10 of the Debtor and Creditor Law which might possible be applicable to this situation are sections 273 and 276. They read as follows:

" § 273. Conveyances by insolvent. Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration."

" § 276. Conveyance made with intent to defraud. Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."

With reference to section 273, while it is clear that the conveyances made rendered the building company insolvent, they were all made for a fair consideration. The consideration for the assignment was the indebtedness under the mortgage; that for the tax payment was the tax liability and the discount for prepayment. Fair consideration is defined in section 272 to include an antecedent indebtedness.

Section 276 requires an actual intent, as distinguished from an intent presumed in law, to hinder, delay or defraud either present or future creditors.

I do not find any such actual intent to hinder, delay or defraud creditors.

The plaintiff argues that an intent to " hinder or delay " a creditor is sufficient under section 276, irrespective of any intention to " defraud." The claim is that the directors by their acts did hin-

der and delay this plaintiff from collecting her judgment immediately. This argument is tantamount to a contention that section 276 was intended to cover every preferential payment, because every preferential payment to a creditor has the effect of hindering and delaying other creditors from the collection of their respective judgments. There is nothing in the provisions of article 10 of the Debtor and Creditor Law which would indicate an intention to make it applicable to all preferential payments. Section 15 of the Stock Corporation Law is still effective as to preferences. The language and purpose of the Debtor and Creditor Law indicate a desire to restrict it to fraudulent transactions only, as defined in article 10 thereof. The disjunctive language used in section 276 is not controlling. It does not obviate the necessity for intentional fraud.

The history of the section clearly indicates that the intent on the part of a debtor " to hinder or delay " creditors is merely incidental to the requirement that there be an intent actually " to defraud." The common law with reference to fraudulent conveyances was embodied in 1570 in statute 13 Elizabeth (Chap. 5) as follows: " For the avoiding and abolishing of * * * fraudulent * * * conveyances * * * which * * * conveyances * * * have been and are devised and contrived of malice, fraud, covin, collusion, or guile, to the end, purpose, and *intent to delay, hinder or defraud creditors* and others of their just and lawful actions, suits, debts, accounts, damages * * * and reliefs, not only to the let or hindrance of the due course and execution of law and justice, but also to the overthrow of all true and plain dealing, bargaining, and chevisance between man and man, without which no commonwealth or civil society can be maintained or continued."

" II. Be it therefore declared, ordained and enacted, * * * that all and every * * * conveyance * * * made to or for any intent or purpose before declared and expressed, shall be from henceforth deemed and taken * * * to be clearly and utterly void, frustrate, and of none effect; any pretence, color, feigned consideration, expressing of use, or any other matter or thing to the contrary notwithstanding."

This statute was enacted only " until the end of the first session of the next Parliament;" but it was continued accordingly and was finally made perpetual by the statute 29 Elizabeth (Chap. 5), passed in 1587. The statute was not again re-enacted with change until 1925. In the meantime its wording remained the same.

The statute itself was only declaratory of the common law. (*Twyne's Case*, 3 Co. Rep. 80 [1601]; *Curtis* v. *Leavitt*, 15 N. Y. 9, 124; *Baker* v. *Humphrey*, 101 U. S. 494; *Seymour* v. *Wilson*, 19

N. Y. 417; 6 N. Y. U. Law Rev. 469; see, also, 1 Moore Fraudulent Conveyances [1908], 13.)

Between the statute's original enactment (1571) and its re-enactment (1925) many cases arose which involved interpretation of the phrase " intent to delay, hinder or defraud creditors." (See 15 Halsbury Laws of England, 78 *et seq.*, and annotations.) Two of these cases are significant: *Wood* v. *Dixie* (7 A. & E. [N. S.] 892) and *Gregg* v. *Holland* (L. R. [1902] 2 Ch. Div. 360).

In the former case the question arose as to whether a sale of property for a good consideration was, either at common law or under statute 13 Elizabeth, 5, fraudulent and void, merely because it was made with the intention to defeat the expected execution by a judgment creditor. It was decided that unless fraud was shown under the statute or at common law, the conveyance was not void. No fraud having been shown, the court refused to avoid it. " The jury were given to understand that, although the conveyance was made *bona fide*, and with full intention that the property should be parted with, it would yet be fraudulent if made with intent to defeat the execution. Such a motive does not defeat the assignment. We are clearly safe in going so far as to say that a mere intent to defeat a particular creditor does not constitute a fraud. We do not say that many considerations may not exist which would induce a jury to come to the conclusion which they have arrived at; but we hold the direction wrong." This case was followed and approved in *Darvill* v. *Terry* (6 H. & N. 807, 811) and in other subsequent cases.

In the second case (*Gregg* v. *Holland, supra*) the question arose as to whether a voluntary settlement on a wife came within the prohibition of the statute since the intent was to delay and hinder creditors. It was argued that " There is an entire absence of any evidence here that the husband was in debt at the date of the settlement, so as to support an inference of ' intent ' (to defraud); nor is ' intent ' to be inferred from the fact that the necessary consequence of what he did was to defeat and delay creditors," and that The court, upholding this contention that there was " nothing to show that the settlement was executed with intent to defraud creditors * * * therefore, the case does not fall within the statute 13 Eliz. c. 5 " (p. 385); refused to avoid it under the act.

These cases continued the unbroken line of authority that fraud was essential under the act and that anything less than fraud, *i. e.*, the mere hindrance or delay of creditors, would not suffice. (See Benjamin Sales [7th ed.], book III, chap. III, pp. 510 *et seq.*, and Blackburn Sale, p. 496.)

In line with this course of the common law, Parliament, when

re-enacting the English statutes in 1925, re-enacted statute 13 Elizabeth, chapter 5, in the following language in part (Law of Property Act, 1925, chap. 20, § 172): "172. Voluntary conveyances to defraud creditors voidable. (1) Save as provided in this section, every conveyance of property, made whether before or after the commencement of this Act, with intent to defraud creditors, shall be voidable, at the instance of any person thereby prejudiced."

In commenting upon the new language employed, Halsbury, in his "Complete Statutes of England," states (Vol. 15, p. 356): "The three subsections of this section in effect replace in a much shortened form Stat. (1571) 13 Eliz. c. 5, sections 1, 3 and 5, * * * note that in place of 'with intent to delay hinder or defraud creditors' this section has merely 'with intent to defraud creditors.'"

This change in the language of the statute only epitomized the decisions under the original act. The courts had consistently held that the prime necessity under the statute was the presence of an intent to defraud, the intent to hinder and delay creditors being merely incidental thereto. In England, therefore, the disjunctive wording of the statute has been actually dropped, following the judicial interpretation of the act.

The evolution of section 276 of our own Debtor and Creditor Law from the original statute (13 Eliz. chap. 5) is illuminating in this discussion. At the twenty-fifth annual meeting of the National Conference of Commissioners on Uniform State Laws, held on August 14, 1915, a resolution was adopted "that the committee on commercial law * * * take into consideration the advisability of drafting a uniform act on the *subject* of fraudulent conveyances." At the next annual meeting the committee reported that they "have interpreted this resolution as contemplating conveyances in fraud of creditors," and that the committee had retained Dr. William Draper Lewis, of the University of Pennsylvania, as draftsman, and submitted the first tentative draft prepared by him. In his explanatory note to this draft Dr. Lewis says: "As to the third source of confusion, the statute the 13th of Elizabeth only condemns as fraudulent conveyances made with the 'intent' to 'hinder, delay or defraud.' * * * While all conveyances with intent to defraud creditors (see section 6) are declared fraudulent, it is expressly stated that the intent must be 'actual intent, as distinguished from intent presumed as a matter of law.'" (In the original and second drafts the first section of Stat. 13 Eliz., chap. 5, was numbered "section 6.")

At the conference held in 1917 the second tentative draft was presented. The section, as in the first draft of 1916, was entitled

"Conveyance Made with Intent to Defraud." The explanatory note says: "This paragraph is practically identical with the 13th of Elizabeth. As the other sections of this act deal with conveyances which are fraudulent as to creditors irrespective of intent, this section is expressly so drawn as to relate to conveyances with intent to defraud. In this manner the act will do away with legal presumptions of fraud, which have been a main cause of existing uncertainty and confusion."

In the final adoption of the uniform law this section (now numbered "section 7") was identical with that later adopted by New York and numbered section 276 of the Debtor and Creditor Law. The prefatory note, too, was identical with that of the first and second tentative drafts.

At no time was there any special consideration given to the use of the disjunctive in the phrase "hinder, delay or defraud." The primary motive was still respected as to the demand of fraud. The section has not materially changed through the centuries. (46 Harv. Law Rev. 404, 405, 421; 25 Columbia Law Rev. 487; 20 id. 339; 6 N. Y. U. Law Rev. 469.)

The uniform statute has been adopted in many States. It was adopted in New York without substantial change in 1925 (Laws of 1925, chap. 254). Although there has been no reported case in the New York courts since that time involving this precise question of interpretation of the phrase "hinder, delay or defraud," it has been decided in other States and in the Federal courts. These cases follow the same line of reasoning as the centuries of decisions in England.

In *Goodhope* v. *Overgaard* ([N. D.] 227 N. W. 380), in construing section 7 of the Uniform Fraudulent Transfer Act, the court said: "A further question is whether the transfers on January 2, 1923, were made with actual intent on the part of Mads N. Overgaard to hinder, delay, or defraud his creditors within the meaning of § 7 (*supra*). Under that section the burden of proof was upon the plaintiff, who is appellant here, to establish by a preponderance of the evidence that the conveyances were made with fraudulent intent. * * * The trial court having found the conveyances were made in good faith, a reversal is justified only by a showing that the finding was against a clear preponderance of the evidence." Judgment was affirmed. (See *James* v. *Joseph*, 156 Tenn. 417; 1 S. W. [2d] 1017.)

In *American S. S. Co.* v. *Wickwire-Spencer Steel Co.* (42 F. [2d] 886, 894; affd., 49 id. 766) HAZEL, J., said (after discussing sections 270 and 276 of the Debtor and Creditor Law): "Under this act there is involved a rule of evidence and of law modifying the prior rule relating to imputable fraud, as distinguished from presumptive fraud, and it clearly puts upon the creditors the burden of proving

that the conveyance or agreement was in fact actually tainted." (See *Lee* v. *State Bank & Trust Co.*, 54 F. [2d] 518; C. C. A. [2d circuit]; certiorari denied, 285 U. S. 547.)

In *Watson* v. *Goldstein* (174 Minn. 423; 219 N. W. 550), after discussing section 7 of the uniform act, HOLT, J., said: " Mindful of the established rule that the burden was plaintiff's to prove actual intent to hinder, delay or defraud, can it be said that the finding made is without support, or, in other words, does the evidence demand a finding of actual intent? We have examined the record with care, and reach the conclusion that the finding on this issue cannot be disturbed by this court. Milton frankly admitted that by the conveyances he intended to prefer his mother to the claim of the plaintiff. There is nothing unlawful in this." (See, also, Garrard Glenn, " The Law of Fraudulent Conveyances," 1931, p. 389, § 289; *Lippman* v. *Sample*, 111 N. J. Eq. 448: 162 Atl. 568; *Finger* v. *Kemp*, [N. J. 1932] 163 Atl. 153; *Krause* v. *Rollar*, [N. J. 1933] 164 id. 456.)

Three other considerations lead to the conclusion that fraud is necessary under section 276: *First*, the title of the section, which has been followed through the years, is " Conveyance made with intent to defraud." Although it is not a part of the section, it is helpful in interpreting it. (§ 94, Statutes and Statutory Construction, vol. I, McKinney's Consol. Laws and annotations.) *Second*, where the use of the word " or " does not actually reflect the true meaning of its use in a statute, the word " and " may be substituted to be more in conformity with the established intent of the framers or legislators. (§ 76, Statutes and Statutory Construction, vol. I, McKinney's Consol. Laws.) *Third*, where precedent has been established by decision over a long time with respect to the interpretation of a prior statute, there should be a similar interpretation of a subsequent statute derived from the earlier one. (*Manhattan Properties* v. *Irving Trust Company*, 291 U. S. 320; 54 S. C. R. 385.) In *Maynard* v. *Elliott* (283 U. S. 273) STONE, J., said: " Only compelling language in the statute itself would warrant the rejection of a construction so long and so generally accepted, especially where overturning the established practice would have such far-reaching consequences as in the present instance. But such language is wanting in section 63." (See, also, *Johnson* v. *Manhattan Ry.*, 289 U. S. 479, 500.) The conclusion seems inevitable that in the absence of fraud a conveyance under section 276 is not void, though it tends to hinder or delay creditors.

Was the assignment of rents to the trustee of the second mortgage a preference which can be set aside, or for which the creditors are liable in damages?

I find that the insolvency of the building company was imminent; that the assignment was given to the Title Guarantee and Trust Company with the intent of giving a preference to the second mortgage bondholders over other creditors, and that the assignee had reasonable cause to believe that the assignment would effect a preference. Under these circumstances was section 15 of the Stock Corporation Law violated? At the time of the transfer the second mortgage was clearly in default, *first*, by reason of the fact that a $5,000 amortization due June 1, 1932, on the first mortgage had not been paid and the thirty-day grace period had expired; *second*, by reason of the failure to pay the interest due on the second mortgage. The bondholders were demanding that they be technically placed in possession by an assignment of rents.

It is clear from the authorities that an assignee of rents takes them in precedence to the rights of a receiver subsequently appointed. (*Harris* v. *Taylor*, 35 App. Div. 462; appeal dismissed, 159 N. Y. 533.) The basis of this rule is that the right to collect rents is actually a part of the security included in the mortgage and originally agreed upon when the mortgage is executed. It is not something new which is given to the mortgagee; it is merely actual possession of what was rightfully his originally in the event of a default. (See *Finance & Guarantee Co.* v. *Oppenhimer*, 276 U. S. 10; *Thompson* v. *Fairbanks*, 196 id. 516.)

The plaintiff herself realized the necessity for paying interest and amortization on the mortgages by including provisions for such payment in the order appointing the receiver in sequestration. Even if the order did not so provide a receiver would be obliged to pay the interest on the mortgages before turning any money over to the benefit of unsecured creditors. To do otherwise would give unsecured creditors an actual preference over secured creditors. Therefore, the assignment was not a voidable preference.

Under the provisions of section 15 of the Stock Corporation Law can the prepayment of the taxes be set aside? The *sine qua non* (notice or reasonable cause to believe on the part of the transferee) is absent. The city knew nothing of the circumstances and had no reasonable cause to believe that an unlawful preference was being granted. While the payment of the taxes was clearly a preference it was not a voidable one under the statute.

But the language of the section does not require the presence of notice or reasonable cause in order to hold the directors liable personally for preferences.

" Every director or officer of a corporation who shall be concerned in the making of any conveyance, assignment, transfer or payment, the suffering of any judgment or the creation of any lien or the

giving of any security by such corporation when it is insolvent or its insolvency is imminent, with the intent of giving a preference to any particular creditor over any of the other creditors of the corporation, or who shall violate or be concerned in violating any other provision of this section shall be personally liable to the creditors and stockholders of the corporation of which he shall be director or an officer to the full extent of any loss they may respectively sustain by such violation."

All that is required is an intentional preference of one creditor over another, and that the director or officer be " concerned " in the making thereof. Originally the sentence read: " Every director or officer of a corporation who shall violate or be concerned in violating any provision of this section shall be personally liable to the creditors and stockholders of the corporation of which he shall be director or an officer to the full extent of any loss they may respectively sustain by such violation." The amendments added: " be concerned in the making of any conveyance, assignment, transfer or payment, the suffering of any judgment or the creation of any lien or the giving of any security by such corporation when it is insolvent or its insolvency is imminent, with the intent of giving a preference to any particular creditor over any of the other creditors of the corporation, or who shall," and then continued the old language in the disjunctive. The obvious intent is not to require everything requisite to setting the transfer aside in order to fasten liability on a director, but merely that there should be an intentional preference in which the director be concerned.

The taxes were not to become a lien until November 1, 1932. They did not become a matured obligation until that date. Clearly the directors had no right to pay this unmatured claim with intent to prefer the city (and the security of both mortgages) over the liquidated overdue obligation owing by the building company to this plaintiff. While the elements to set aside the conveyance are lacking because of the lack of knowledge by the city, the plaintiff still has his claim for damages against the directors for intentionally depleting the corporate treasury by this preferential payment.

For how much are the directors liable to this plaintiff for the preference? May the plaintiff recover for the June and July rent, only, or for all the loss sustained during the balance of the term of the lease? The liability created by section 15 of the Stock Corporation Law against directors and officers is for the loss sustained by creditors. Instead of requiring an action by the corporation itself to restore its funds the creditors become entitled in their own right to recover the damages sustained. (*Caesar* v. *Bernard*, 156 App. Div. 724; affd., 209 N. Y. 570.) The recovery,

however, is limited not by the extent of the debt, but by the " extent of any loss they may respectively sustain by such violation." This would obviously exclude future rent accruing after the preferential transfer were made. Nor can one creditor be reimbursed for his loss at the expense of other creditors, and thus obtain a preference himself over others. The " ' loss ' sustained was the sum plaintiff would have received, had the corporation been wound up and its property, so far as improperly transferred, converted to money and applied to the payment of its debts *pro rata*." (*Penn. R. R.* v. *Peddrick*, 234 Fed. 781, 786. See *Lodi Chemical Co.* v. *Nat. Lead Co.*, 41 App. Div. 535; *Curran* v. *Oppenheimer*, 164 id. 746; affd., 222 N. Y. 615; *Trustees of Masonic Hall* v. *Fontana*, 99 Misc. 497.)

*Trustees of Masonic Hall* v. *Fontana* (*supra*) was an action brought by plaintiff as creditor of a corporation under section 66 (now section 15) of the Stock Corporation Law against directors of the corporation for the loss sustained by reason of a transfer of its property to defendant Fontana in payment of an antecedent debt. The transfers took place on February 21, 1916, and February 29, 1916, and amounted to $1,238.34. At the time such payments were made the corporation was in possession of an office under a written lease from the plaintiff, which did not expire until February 1, 1918, at a rental of $100 per month, payable monthly in advance. The rent due for the months of December, 1915, and January and February, 1916, had not been paid. Plaintiff brought suit against the corporation on February 18, 1916, to recover the rent under the lease for the months of December and January, and recovered a judgment on March 10, 1916, for $369.81. Execution was issued and returned unsatisfied. The corporation likewise failed to pay rent for the months of March and April, 1916, amounting to $200. Thereafter the plaintiff relet the premises at a rental which was $16.66 per month less than the original rent. The difference in rent amounted to $366.52 for the unexpired term of the lease. None of the indebtedness was paid. A judgment was rendered by the trial court against the directors for $963.33, the total amount.

The court, on appeal, said: " The recovery is not to be measured by the amount of the debt, but is limited to the *loss sustained.* * * * At the time of the preferential transfers complained of the only amount then due from the corporation to the plaintiff was for installments of rent under the lease for the months of December, January and February, but, as the plaintiff had commenced its action for rent after February first without including a claim for February rent, the judgment recovered is a bar to the recovery of the rent payable February 1, 1916. [Citing cases.]

" As to the rent accruing after the preferential transfers and as to the loss suffered by plaintiff in reletting the premises at a lower rental, the plaintiff cannot be considered a creditor who had suffered ' loss ' by reason of such transfers.

" The lease created a contingent liability which only ripened into a debt as the premises were used or as the rent of each month fell due. (*Sanford* v. *Rhoads*, 113 App. Div. 782–784.) * * * The plaintiff was undoubtedly a creditor at the time of the prohibited transfers. The only question to be determined is the ' full extent of any loss ' which is suffered by reason of the violation of the statutes. * * *

" The defendant Fontana was at the time a creditor of the corporation for money advanced for salaries and upon three notes, all past due, amounting on February 29, 1916, to $1,731.76. The plaintiff in its action, which was then pending, subsequently recovered a judgment for $369.81. The total debts of the corporation, therefore, amounted at that time to $2,101.57. The total assets of the corporation were $1,249.34. The amount of plaintiff's loss therefore was $219.84, for which amount, with interest from February 29, 1916, judgment should have been awarded." (See, also, *Caesar* v. *Bernard*, *supra*.)

In *Lodi Chemical Co.* v. *National Lead Co.* (*supra*) the court said: " A diligent creditor pursuing his remedy, and for the enforcement only of his own right, may be ordinarily entitled to a preference; but in an action based on this statute, where no individual lien has been acquired which would give priority, the purpose and object of the statute must be considered. * * * If the design and purpose of the 48th section (predecessor of sec. 15, Stock Corporation Law) is to secure equality among creditors, it would be inconsistent to allow one creditor, by means of the right of action given by the statute, to gain that preference through the law which another creditor is prohibited from getting directly from the debtor by the same law. * * * although none of those creditors may have made themselves parties to the action before judgment, that is not sufficient to deprive them of their distributive shares in the assets of their debtor."

In *Curran* v. *Oppenheimer* (*supra*) the court said, with reference to sections 90 and 91 of the General Corporation Law: " A creditor's remedy under a situation similar to that presented by this record, I think extends only to the property which would have been, but for the action of the directors, applicable to the payment of his claim." (See, also, *National Bank of Auburn* v. *Dillingham*, 147 N. Y. 603; *Johnson* v. *Nevins*, 87 Misc. 430.)

Based upon these authorities, the liability of the directors is limited

to the rent of June and July. But not all of the plaintiff's rent is recoverable under the rule of apportionment laid down in the foregoing cases. She will be entitled only to her *pro rata* share of the assets based upon the total accrued indebtedness of the corporation on the date of the transfer. The only exception to this rule appears to be where one judgment creditor has actually levied a legal execution upon assets attempted to be transferred to another. In such cases the execution creditor is permitted to retain them for himself. (*Newman* v. *Meisel-Galland Co., Inc.*, 237 App. Div. 95; affd., 261 N. Y. 651.) There was no such levy in this case.

The total indebtedness on July 1, 1933, included: Rent for June and July, $2,442; interest on outstanding second mortgage certificates, $19,075; interest accrued on first mortgage, $3,520.83; rental deposit, $386; miscellaneous debts testified to, $3,942.57; total, $29,366.40. The $5,000 amortization payment on the first mortgage had been waived. The assets actually transferred were $15,534.79. Plaintiff is, therefore, entitled to $1,295.44 from the directors.

Claim is made by the plaintiff that the entire meeting of June 30, 1932, is a nullity because of the failure to give proper notice to the director Lawrence McGuire and the failure on his part to sign the waiver of notice. Since the meeting Mr. McGuire has been aware of all of the acts taken, and has never objected thereto either personally or in his capacity as a director. The corporation itself ratified in all respects the acts of the directors at a stockholders' meeting held immediately after the directors' meeting. The resolutions adopted by the directors at the meeting of June thirtieth were all fully carried out. Since that time the building company has taken no steps to undo any of the acts. Neither principle nor authority requires a court at this date to attempt to set them aside.

In *Reed* v. *Hayt* (51 N. Y. Super. Ct. 121; affd. on opinion below, 109 N. Y. 659) only three of the five directors were present at a meeting, one director not having been notified at all. The court (at p. 132) said: " Similar considerations apply to the third position, that the meeting of directors was invalid for want of notice to them. * * * So far as the proof of the defendant discloses, every one interested had countenanced or ratified the plaintiff dealing with the stock as owner, with a knowledge of the facts, and the action referred to would not lie." The meeting was held valid.

In *Chambers* v. *Sterling Automobile Mfg. Co.* (163 N. Y. Supp. 574) the action of the board was objected to on the ground that four of the five directors had waived notice of the meeting and one of the directors had not been notified and did not attend the meeting. The court, holding the meeting valid, said: " The other directors

were all present and acted. The by-laws of the defendant provide that ' notice of special meetings shall be served on each director in person or by mail * * * at least three days ' before the day designated for the meeting. The omission to notify the director, and his absence, were irregularities which the corporation had power to waive. At most, the resolution was voidable, and might have been ratified by the defendant." (See, also, 4 Cook Corp. [8th ed.] § 713-a, p. 2942.)

The law is inclined to tolerate more freedom in the notice and the calling and holding of directors' meetings, inasmuch as the meetings are more frequent, the absences more common, the acts less fundamental and ratification by acting on the contracts more certain and easy. Acquiescence in the action of a board, even if not legally convened, has frequently been held sufficient to legalize such action.

In *Gerard* v. *Empire Square Realty Co.* (195 App. Div. 244, at p. 249) the court said: " To hold that in all instances technical conformity to the requirements of the law of corporations is a condition to a valid action by the directors would be to lay down a rule of law which could be used as a trap for the unwary who deal with corporations, and to permit corporations sometimes to escape liability to which an individual in the same circumstances would be subjected."

In *Paducah & Illinois Ferry Co.* v. *Robertson* (161 Ky. 485; 171 S. W. 171) a meeting was held by two of the three members of the board of directors. The third was not notified of the meeting but accidentally stopped at the meeting place but left without participating in the meeting or waiving notice. The meeting was held to take some emergency action. The court said (at p. 496): " His absence still left a majority of the board of directors to take action, and this they did * * *. We think the action thus taken by a majority of the board of directors was valid."

In *Dickinson* v. *Citizens' Ice & Fuel Co.* (139 Minn. 201; 165 N. W. 1056) two directors not notified were absent at a meeting at which action was taken by the remaining seven directors of the corporation in consultation with its attorney. The court (at pp. 203, 204) said: " It is true this meeting is termed illegal because not called as specified in a by-law. But a majority of directors were there, and all evidently considered it a proper meeting at which to authorize the settlement * * *. Instead of taking immediate steps to repudiate what the president and secretary had done, these individual directors acquiesced therein for over a month * * *. Such conduct should now preclude the corporation from asserting want of authority."

In *Gorrill* v. *Greenlees* (104 Kan. 693, 699; 180 Pac. 798) the

plaintiff sought to set aside the action of the board of directors taken at a meeting where only five of the eight directors were present pursuant to notice, the other three not having been notified. The court said, in holding the meeting valid, citing among numerous authorities *National Bank* v. *Shumway* (49 Kan. 224): " A corporation is, after all, but a human concern, and, like natural persons, is often bound by conduct which has not followed the beaten path of technical formality. If the governing body, the directors, act for the corporation, the result must be governed, not by the degree of formality observed, but by the practical and legal effect of such action  *  *  *. Those [directors] absent did not complain or find any fault with what the majority did and were very likely satisfied therewith."

In *Moller* v. *Keystone Fibre Co.* (187 Penn. St. 553) the plaintiff sought to set aside an assignment voted to be made at a meeting of the board of directors where only three of the five directors were present. No timely notification was given to the other two. The court said (at p. 563): " The learned court below found as a fact that two of the five directors of the company did not have timely notice of the meeting at which the assignment was authorized, and held that on this ground it was voidable, but held also that as no officer or stockholder of the company had made any objection to it, their acquiescence must be accepted as a ratification of it, and cited *Gordon* v. *Preston* (1 Watts, 385) as authority for its conclusion respecting the first objection made to the validity of the assignment. In this conclusion we concur."

Defendant Trunk was not present at the meeting of June 30, 1932. Unquestionably, however, he knew what had been done; and all of his subsequent conduct must be taken as a ratification thereof. His absence does not absolve him of liability. In *Four Corners Building & Loan Assn.* v. *Schwarzwaelder* (88 N. J. Eq. 212; 101 Atl. 564) the defendant director was absent from a meeting at which certain action was taken. He was, however, held chargeable with notice of what was done at the meeting and with liability for negligence in not preventing its being done, the court saying, " it is no excuse to say that the defendant was ignorant and incompetent or so engrossed in his own affairs as not to be able to give proper attention to the affairs of the building and loan association. He was bound to apply to his duties as director of the building and loan association that degree of care which an ordinarily prudent man would exercise with respect to his own affairs." (See also, *Walker* v. *Man*, 142 Misc. 277.)

It does not appear that defendant Trunk ever took steps to undo any of the action taken by the board as far as it concerned him.

He was willing to acquiesce in its determination and must accordingly be willing to share in its responsibility.

In conclusion, the directors were guilty of no fraud. While legal advice was no excuse, seeking it was an indication of the intention which prompted the action. They did participate in the creation of a preference for the benefit of the city of New York, without any desire, however, to gain any benefit for themselves thereby but in the hope that all creditors would ultimately benefit. Laudable as their purpose was, the law imposes liability upon them for the loss sustained by this plaintiff-creditor thereby. The amount is fixed *supra* at $1,295.44. Settle findings.